Samuel G. WHITAKER et ux., Plaintiffs,

v.

TEXAS COMPANY, a corporation, Defendant.

Civ. No. 4466.

United States District Court
E. D. Oklahoma.

July 21, 1959.

Rainey, Flynn, Anderson & Welch, Oklahoma City, Okl., for plaintiffs.

Elmer W. Adams, Tulsa, Okl., for defendant.

WALLACE, District Judge.

Plaintiffs, Samuel G. and Ann Elizabeth Whitaker, Oklahoma citizens, bring this action against the defendant, The Texas Company, a Delaware corporation, to establish judicially the expiration of an oil and gas lease given by plaintiffs on their undivided fractional mineral interest in some 306 acres in Stephens County, Oklahoma.[1] The amount in controversy exceeds $3,000, exclusive of interest and costs.

The lease in question was executed by plaintiffs on March 12, 1948, in favor of one L. A. Edwards; shortly thereafter Edwards assigned the lease to the defendant company. Such lease was granted for a primary term of ten years, "and as long thereafter as oil or gas, or either of them, is produced from said land by the lessee."[2]

On December 12, 1957, upon Goff-Leeper Drilling Company's application, the Oklahoma Corporation Commission entered an order establishing 40-acre drilling and spacing units for the production of oil and gas from the Niles Sand of the Cisco formation common source of supply underlying all of Section 15 and the N/2 of the instant Section 16. Such order designated each governmental quarter-quarter section as the drilling unit and provided that the permitted well should be located in the center of the unit or within a prescribed tolerance. Furthermore, the order provided that "all royalty interest within any spacing unit shall be communitized and each royalty owner within any unit shall participate in the royalty from the well drilled thereon in the relation that the acreage owned by him bears to the total acreage in the unit." [3]

On January 17, 1958, an operating agreement was entered into between Tidewater Oil Company, Gulf Oil Corporation and The Texas Company, the owners of the working interests underlying the SE/4 of the NE/4 of said Section 16, wherein Tidewater, as operator, agreed to commence a well on the 40-acre drilling and spacing unit in question and to drill the same to test the Niles Sand of the Cisco formation or to a total depth of 8500 feet, whichever was lesser.[4] This well, the Hervey No. 1, was commenced on January 25, 1958, and spudded in at a point on the northwest corner of the SE/4 of the SE/4 of the NE/4, immediately east of plaintiffs' 10-acre tract embraced in the 40-acre Hervey Unit.[5] About February 17th the well reached the Niles Sand at 7510 feet. Two drill stem tests were taken at the interval

1. This 306 acres is in Section 16, Township 2 North, Range 7 West. At the time the lease was executed, plaintiffs owned an undivided one-half mineral interest therein, except two 20-acre tracts under which they owned all the minerals; and the Gulf Oil Corporation owned the remaining undivided interest. The present mineral ownership remains the same except for a number of townsite lots located in the S/2 of the NW/4 of said section, known as Whitaker's Addition to the City of Marlow, Oklahoma, the title to said lots (including the mineral rights therein formerly owned by plaintiffs) being vested in numerous parties to whom plaintiffs sold said lots after execution of the instant lease and prior to the filing of this action.

2. The required payments of delay rentals were made during the entire primary term.

3. This order, No. 36063, has remained continually in force and effect since its issuance.

4. This 40 acres embraced 30 acres on which Tidewater had a lease and 10 acres falling within the Texas Company lease from plaintiffs. Tidewater agreed to pay ¾th of the well cost; Gulf and Texas Company each agreed to pay ⅛th of the cost thereof.

5. Plaintiffs' 10 acres is described as the SW/4 of the SE/4 of the NE/4.

between 7510 and 7533 feet and thereupon drilling was continued until about March 10th when the Upper Wade Sand (located from 8526 to 8589 feet) was encountered.

On March 13th the plaintiffs demanded a release of the lease in suit asserting that such lease had expired.

The Hervey No. 1 was drilled to a total depth of 8912 feet and on March 21st the casing was set at 8706 feet. On March 25th on a natural test of the Niles Sand, the well swabbed dry with a slight show of oil and gas; on March 26th the Niles was treated with sandfrac.

On April 1, 1958, Tidewater's application for 160-acre spacing of the Upper Wade for gas and gas condensate in the area in question was heard and granted.[6] Under said order the NE/4 of said Section 16 was designated as a drilling and spacing unit for the production of gas and gas condensate from the Upper Wade Sand common source of supply and the Hervey No. 1 was designated as the unit well for said 160-acre unit. This order provided that "all royalty interests within any spacing unit shall be communitized and each royalty owner within any unit shall participate in the royalty from the well drilled thereon in the relation that the acreage owned by him bears to the total acreage in the unit."

From April 2, 1958, until July 24, 1958, the Hervey No. 1 well produced 434 barrels of oil from the Niles Sand. By July 24th the oil from the Niles was completely exhausted as evidenced by a 24-hour production test on that date which yielded one-half barrel of oil and one-half barrel of salt water.

Defendant first urges that the sued upon leasehold property was "pooled as to all sands" with the Tidewater lease in the Hervey Unit at the time the Hervey No. 1 well was initiated and that consequently plaintiffs' lease was extended beyond the primary term inasmuch as the Hervey No. 1 well was not only commenced within the primary term of plaintiffs' lease but resulted in the discovery of "commercial production" within such term when the Upper Wade was penetrated on March 10th. On this, the defendant errs.

■ Plaintiffs' lease did authorize the defendant to pool such leasehold property with other properties if the lessee deemed such advisable.[7] However, in order to exercise such contractual right, the defendant had to "execute in writing an instrument identifying and describing the pooled acreage" and thus evidence its intention to so pool. The operating agreement of January 17, 1958, cannot be construed as a written declaration of pooling executed for the purpose of pooling plaintiffs' property pursuant to the pooling authority granted to the lessee in the lease. The agreement entered into by the defendant with Gulf and Tidewater was just what it was entitled,—an operating agreement. And, there is no language contained therein which implies that such agreement was also intended to effectuate a pooling of all sands embraced by the Texas Company and Tidewater leases. Moreover, significantly, Tidewater did not have a comparable provision in its lease giving Tidewater as lessee the discretionary power to pool such leased property by merely executing a written declaration.

■ Plaintiffs assert that the lease in question has expired by its own terms due to the failure of the defendant company to drill a well which was physically

6. Oklahoma Corporation Commission Order No. 36780.

7. This provision stated in part: "Lessee is hereby given the right and power to pool or combine the acreage covered by this lease or any portion thereof with other land, lease or leases in the immediate vicinity thereof, which in lessee's judgment it is necessary or advisable to do so in order properly to develop and operate said premises in compliance with the spacing rules of any lawful authority, or when to do so would, in the judgment of lessee, promote the conservation of the oil and gas in and under and that may be produced from said premises, * * *. Lessee shall execute in writing an instrument identifying and describing the pooled acreage. * * *"

located upon plaintiffs' leased property. However, this is an over-simplification of the problem at hand. As indicated by this court in overruling plaintiffs' motion for summary judgment, when the Hervey No. 1 was commenced and drilled to the Niles Sand of the Cisco formation, the existence of the Commission's spacing order of December 12, 1957, in legal contemplation placed the Hervey No. 1 well on the plaintiffs' property as effectively as if such well had been drilled on plaintiffs' lease *insofar as the Niles Sand of the Cisco formation common source of supply was concerned.*[8]

Thus, the critical issue is one of whether sufficient oil was discovered and produced from the Cisco formation to extend the instant lease beyond the primary term of March 12, 1958, through the operation of the "thereafter clause" of this lease.

Although the recovered oil was small in amount as to the Cisco formation, the court can but find, from the evidence of record, that oil "in paying quantities" was extracted from the Cisco, inasmuch as the total production of 434 barrels of oil from April through July resulted in a slight net profit to the working interest owners.[9]

 The instant well, as to the Cisco formation, was commenced prior to the expiration of the primary term of plaintiffs' lease. This sand was first penetrated on February 17th, at a time still prior to the lease's expiration. The lessee had a reasonable length of time thereafter to complete the well in such sand and to produce therefrom. When oil *in paying quantities* was produced beginning April 2, 1958, within a reasonable length of time measured by due diligence, such production brought about an extension of the lease in question beyond the primary term. The conditional right to diligently complete a well timely started matured into an extension of the lease when oil in paying quantities was procured from the Niles Sand of the Cisco formation.[10] The lease, so extended, is now held due to the discovery of gas and gas condensate in paying quantities in the Upper Wade, which must be deemed to have been discovered on plaintiffs' property April 1, 1958, the date the 160-acre spacing order was entered and completed with "reasonable diligence and dispatch" when the well was completed in the Upper Wade Sand early in August, 1958.[11]

The sued upon lease has not expired. The defendant is entitled to have its title therein quieted.

Within fifteen days counsel should submit for the court's signature a written judgment which conforms with this opinion.

8. Panhandle Eastern Pipe Line Company v. Isaacson, 10 Cir., 1958, 255 F.2d 669.

9. Defendant's evidence establishes a net profit of $52.33 for such period. Plaintiffs' calculations (from the gauge tickets) indicate only 415 barrels of oil were produced and that a net loss for the complete history of the well in the Cisco formation was sustained. However, plaintiffs' evidence *does not* alter the result inasmuch as their own chart indicates that there was a period of at least 20 to 30 days that the value of the oil produced exceeded the operating cost. Such was adequate to extend the primary term under the "thereafter" clause. As mentioned in Walden v. Potts, 1944, 194 Okl. 453, 152 P.2d 923, 924; "We are committed to the rule that the clause in an oil and gas lease continuing the lease in force as long as oil or gas is produced in 'paying quantities' means that if oil is actually produced in such quantities as will pay a profit to the lessee over operating expenses it is produced in paying quantities, though it may never repay the cost of drilling and equipping the well or wells. (citing authorities)" Also, see Henry v. Clay, Okl.1954, 274 P.2d 545; Denker v. Mid-Continent Petroleum, 10 Cir., 1932, 56 F.2d 725, 84 A.L.R. 756.

10. Skelly Oil Company v. Wickham, 10 Cir., 1953, 202 F.2d 442, 445.

11. As mentioned in the lease: "If the lessee shall commence to drill a well within the term of this lease or any extension thereof, the lessee shall have the right to drill such well to completion with reasonable diligence and dispatch, and if oil and gas, or either of them, be found in paying quantities, this lease shall continue and be in force with like effect as if such well had been completed within the terms of years herein first mentioned."