Samuel G. **WHITAKER** and Elizabeth Whitaker, Appellants,

v.

**TEXACO INC.** (formerly named The Texas Company), a corporation, Appellee.

No. 6259.

United States Court of Appeals
Tenth Circuit.

Oct. 5, 1960.

Gordon F. Rainey, Oklahoma City, Okl. (Dan M. Welch, and Rainey, Flynn & Welch, Oklahoma City, Okl., of counsel, were with him on the brief), for appellants.

Elmer W. Adams, Tulsa, Okl. (Philip R. Wimbish, Tulsa, Okl., was with him on the brief), for appellee.

Before MURRAH, Chief Judge, and PHILLIPS and BREITENSTEIN, Circuit Judges.

BREITENSTEIN, Circuit Judge.

In this quiet title action appellants-plaintiffs, herein referred to jointly as the Whitakers, sued to obtain a declaration that an oil and gas lease given by them had terminated because of non-development within the primary term of

the lease. The trial court held that the term had been extended by a well drilled off the leased land but within a spacing unit which had been established by the Oklahoma Corporation Commission and which included a part of the leased premises.[1] Jurisdiction is based on diversity.

On March 12, 1948, the Whitakers, as lessors, executed an oil and gas lease to one Edwards, lessee, for a primary term of 10 years from that date "and as long thereafter as oil or gas, or either of them, is produced from said land by the lessee." Edwards assigned to Texaco. The lease described an irregular tract of land containing 306 acres and lying in Section 16, Township 2 North, Range 7 West, Stephens County, Oklahoma.

The Oklahoma Corporation Commission, by its December 12, 1957, spacing order covering all of Section 15 and the North Half of Section 16, created 40-acre drilling and spacing units for the Niles Sand of the Cisco formation. A portion of the lands involved here is in the North Half of Section 16 and includes the Southwest Quarter of Southeast Quarter of Northeast Quarter, a 10-acre plot within the 40-acre spacing and drilling unit described as Southeast Quarter of Northeast Quarter of Section 16. The other 30 acres of this unit were owned by other parties and leased to Tidewater Oil Company. The spacing order permitted one well in each 40-acre unit, such well to be located in the center of the unit with an allowable tolerance of 150 feet.

The Whitakers owned an undivided ½ mineral interest in the mentioned 10 acres and Gulf Oil Corporation owned the remaining mineral interest. Texaco, Tidewater and Gulf entered into an agreement whereby Tidewater was to drill on the 40-acre unit in question to a depth sufficient to test the Niles Sand, or to a total depth of 8,500 feet, whichever was lesser. Tidewater was to pay ¾ of the drilling cost and Texaco and

Gulf each ⅛ and production was to be divided in the same proportions.

The well, known as Hervey No. 1, was located 100 feet southeast of the center of the unit on land covered by Tidewater's leases. On February 18, 1958, the well reached the Niles Sand. After this horizon was tested, the well was drilled into the Upper Wade Sand where gas was discovered on March 10, 1958. On April 1, 1958, the Corporation Commission entered a spacing order covering the Upper Wade Sand in the area here involved.

The decisive issue is whether the term of the Whitakers lease has been extended by the Hervey No. 1 well. The Whitakers contend that it has not because: (1) the well is not located on their lease; (2) a continuation of the lease may not result from any application of the Oklahoma conservation statute or from any spacing order entered thereunder; and (3) the well does not satisfy the requirements of the "thereafter" clause of the lease.

Admittedly, the Hervey No. 1 well was not drilled on land covered by the lease from the Whitakers. The off-lease location does not satisfy the requirements of the lease unless the spacing order, the commencement of drilling operations within the unit, and the subsequent discovery of oil or gas have the legal effect of continuing the lease.

The Oklahoma statutes relating to the conservation of oil and gas[2] empower the Commission "to establish well spacing and drilling units of specified and approximately uniform size and shape covering any common source of supply." One well only on each unit may be produced from the common source of supply and the well permitted on each unit "shall be drilled at the location thereon as prescribed by the Commission." After the entry of a spacing order the drilling or operation of a well at a location other than that specified by the Commission

---

1. The opinion of the trial court is reported at 176 F.Supp. 395.

2. 52 Okl.St.Ann.1951 § 87.1.

is expressly prohibited. When two or more separately owned tracts are embraced within a unit or where there are undivided interests separately owned, the owners of the working interests may pool their interests voluntarily or the Commission may compel pooling. The portion of production allocated to royalty interests "shall, when produced, be considered as if produced by such owner from the separately owned tract or interest by a well drilled thereon."

In Simpson v. Stanolind Oil & Gas Co., 10 Cir., 210 F.2d 640, 642, this court said that the purpose of the Oklahoma statute is "to prevent waste and effect conservation of oil and gas" and that the object of the statute has no relation to the termination of oil and gas leases or the continuation of leases beyond the primary terms thereof. The facts in that case bear no similarity to those here presented. Simpson sued for breach of contract on the ground that Stanolind had drilled at a location which was not permitted by a spacing order. After the completion of the well, the Commission granted a location exception. The court held that the drilling at the unpermitted but later approved location resulted in no actionable injury to the lessors.

Recognizing that the Simpson decision did not involve the continuation of a lease beyond its primary term, the court said in Panhandle Eastern Pipe Line Company v. Isaacson, 10 Cir., 255 F.2d 669, 672, that Simpson had no application to the situation there presented. Panhandle raised the question of whether a term mineral interest, created by a deed which provided for continuation of the term in the event that production was first had within the term, was continued when a portion of the premises was within a spacing unit including other land on which commercial production was obtained before the expiration of the pri-

mary term. The court said that the spacing order did not extend the primary term but "set the stage for the extension of the term by an activity which met the requirements of the 'thereafter' clause and which occurred somewhere within the spacing unit."

Counsel for the Whitakers distinguish the case at bar from Panhandle upon the dual grounds that in Panhandle royalty interests were involved rather than working interests and that Panhandle was dealing in effect with a "completion" lease while here a "commence" lease covers the premises. They also urge that if the cases are not distinguishable, Panhandle conflicts with Simpson and announces an erroneous rule of law.

■ We see no distinction between this case and Panhandle which would require a different result from that reached in Panhandle. The question is one of lease continuation, not of compulsory unitization. The fact that upon the entry of a spacing order royalty interests are pooled by operation of law whereas working interests are pooled only upon voluntary agreement or upon a separate Commission order forcing unitization[3] is unimportant. The Whitakers are concerned with royalty interests and the statute protects them. The owners of the working interests are not complaining. They have made a contract which fixes liability for expenses and provides for the sharing of production.

■ The difference between a "completion" lease and a "commence" lease[4] has no effect on the problem presented. Oklahoma has held that in a situation involving a non-statutory unitization a lessee, holding under a "commence" lease and having commenced a well within the primary term on land within the unit but off the leased land, is "entitled to the same protection from expiration of the

3. 52 Okl.St.Ann.1951 § 87.1(d).

4. As to the distinction between "completion" and "commence" leases see State ex rel. Commissioners of Land Office v. Carter Oil Company of West Virginia, Okl., 336 P.2d 1086, 1090. Essentially, the difference is that in the first instance the well must be completed within the primary term whereas in the second it is sufficient if it is commenced within that term.

lease contract as though the well were located upon the lands specifically described in plaintiffs' lease." [5] There is no reason for the application of a different rule in a case such as this where by express language the lease is made subject to all state laws and executive orders.

Simpson and Panhandle are not in conflict. Simpson holds that it is not the objective of the statute either to terminate or to continue oil and gas leases. Panhandle, in dealing with a different issue than that presented in Simpson, recognizes the Simpson decision and holds that a "thereafter" clause and a spacing order may combine to continue a lease by the drilling of a well within a spacing unit but off the leased premises if the well otherwise satisfies lease requirements. The important question is whether the Panhandle decision is in accord with Oklahoma law.

A re-examination of Panhandle convinces us that under Oklahoma law, which we are bound to follow, the principles there announced are correct. Panhandle and the case at bar involve factual situations which have one material difference from any Oklahoma case concerned with the problem of the effect of a spacing order on the continuation of a lease by a well drilled within a spacing unit but off the leased premises. In Panhandle a part of the leased premises was without the spacing unit on which the producing well was drilled and was

within another spacing unit.[6] The case at bar presents a lease of an irregular tract some of which is within the spacing unit on which the well was drilled, some within other spacing units, and some located on land not covered by any spacing order.[7]

All of the pertinent Oklahoma cases to which our attention has been directed [8] presented situations in which it was impossible to drill another well on the leased premises without violating the spacing orders. In Panhandle a well could have been drilled on Section 21 and in the case at bar a well could have been drilled at various locations, except on the unit where the well is presently located, without the violation of any spacing order.

The claim of the Whitakers is that the lease terminated for non-development within the primary term. We are not here concerned with the cancellation of a lease, or of a part of a lease, because of a breach of the implied covenant to develop. The importance of this distinction may not be overlooked. In the Carter Oil case the Oklahoma Supreme Court held that a lease covering the South Half of a section comprising a spacing unit was continued by a well drilled on the North Half. Applying the same reasoning here the Hervey No. 1 well, drilled on a 40-acre spacing unit, continued the lease on premises located within that unit even though the well was not drilled on such premises.[9] This being true, the

---

5. McClain v. Harper, 206 Okl. 437, 244 P. 2d 301, 303.

6. In Panhandle there were 640-acre units corresponding to government survey sections. The lease covered the West Half of the Southwest Quarter of Section 22, the spacing unit on which the well was drilled. Another spacing unit was Section 21 and the lease covered the East Half thereof.

7. The spacing order creates 40-acre units in Section 15 and in the North Half of Section 16. The lease is for 306 acres and includes land located in the South Half of Section 16 without the area covered by the spacing order. It also includes land, other than that within the spacing unit here involved, located within

the area affected by the spacing order and comprising several 40-acre units.

8. Kunc v. Harper-Turner Oil Company, Okl., 297 P.2d 371; Trawick v. Castelberry, Okl., 275 P.2d 292; and State ex rel. Commissioners of Land Office v. Carter Oil Company of West Virginia, supra. See also Gregg v. Harper-Turner Oil Co., 10 Cir., 199 F.2d 1.

9. Compare 52 Okl.St.Ann.1951 § 287.9, a part of the Oklahoma unitization statute, which provides, among other things: "Wells drilled or operated on any part of the unit area no matter where located shall for all purposes be regarded as wells drilled on each separately-owned tract within such unit area."

entire lease is continued unless it may be separated into parts.

The Panhandle decision, relying principally on Kunc v. Harper-Turner Oil Company, supra,[10] held that the lease could not be separated.[11] It may be that such reliance was on statements which are dicta but that does not change the situation. In Hawks v. Hamill, 288 U.S. 52, 56 et seq., 53 S.Ct. 240, 77 L.Ed. 610, a case arising in Oklahoma, the United States Supreme Court held that a statement of law announced by the Oklahoma Supreme Court should be followed even though it was dictum.[12] We followed Hawks v. Hamill in applying state court dictum in Home Royalty Ass'n v. Stone, 10 Cir., 199 F.2d 650, 654, and Jess Edwards, Inc. v. Goergen, 10 Cir., 256 F.2d 542, 544. In so doing we were in accord with the rule that has been announced in Oklahoma. In that state the court prepares a syllabus which is filed with an opinion. In City of Altus v. Martin, Okl., 268 P.2d 228, 234, the Oklahoma Supreme Court followed a statement contained in a court-prepared syllabus even though it was dictum, the court saying: " * * * it was adopted by this court, has not been overruled, and is a part of the law of this state." [13]

In the Kunc decision it was clearly said that pooling by the Commission does not have the effect of creating two separate leasehold estates. This was followed by the statement that "unitization of a portion of a lease with other lands does not affect the terms of the lease." [297 P.2d 376] The question of whether the possible inconsistency between those two statements should remove the dictum from the application of the rule requiring federal courts to follow an enunciation of local law by way of dictum is not controlling here because in the Carter Oil case the Oklahoma Supreme Court cited with approval our decision in the Panhandle case in circumstances which indicate an understanding of that decision and its implications. While again the statement may have been dictum, it was well considered, clear and unequivocal. It is consistent with the Kunc decision and not contrary to any Oklahoma decision to which our attention has been directed. We are bound to follow it. Neither the spacing order nor the Hervey No. 1 well separated the lease into two parts, one covering the area located within the unit on which the Hervey No. 1 well was located and the other covering the area located without that unit.

■ Such result does not affect in any way the rights and obligations of the parties arising from the implied covenant of the lessee to reasonably develop the land after the discovery of oil or gas in paying quantities.[14] No question of cancellation of a part of the lease because of breach of that implied covenant [15] is presented to us. We are not concerned with the right of a lessor to have cancellation of a lease for breach of the implied covenant to develop as to that portion without a spacing unit which includes a part of the leased premises and on which an off-lease well has obtained commercial production.[16] Our

10. See 255 F.2d 674, note 18.

11. In the Kunc decision, 297 P.2d 376, it was said: "We think the pooling by the Corporation Commission does not have the effect of creating two separate leasehold estates and that unitization of a portion of a lease with other lands does not affect the terms of the lease, whether production is from the portion of the unit from the lease under consideration or from another portion of the unit."

12. The Court said, 288 U.S. 59, 53 S.Ct. 242: "At least it is a considered dictum, and not comment merely obiter. It has capacity, though it be less than a decision, to tilt the balanced mind toward submission and agreement."

13. 268 P.2d 234.

14. See 2 Summers, Oil and Gas § 398, p. 559, and Oklahoma cases cited on p. 564.

15. Cf. Sauder, Administratrix, v. Mid-Continent Petroleum Corp., 292 U.S. 272, 281, 54 S.Ct. 671, 78 L.Ed. 1255, rehearing denied 292 U.S. 613, 54 S.Ct. 856, 78 L.Ed. 1472.

16. Cf. Merrill, Covenants Implied in Oil and Gas Leases § 227, p. 215 (2d 1959 Supp.).

decision is limited to the conclusion that the drilling of the Hervey No. 1 well on a spacing unit which included a portion of the leased premises had the effect of continuing the lease under the "thereafter" clause if that well otherwise satisfies the lease requirements.

The "thereafter" clause continues the lease beyond the primary term as long as oil or gas, or either, "is produced from said land by the lessee." The "commence" clause provides that if a well is commenced within the primary term and diligently drilled with resulting discovery of oil or gas in "paying quantities" the lease shall be continued with the same effect as though the well had been completed within the primary term.

■■ In Oklahoma the terms "produced" and "produced in paying quantities" mean substantially the same thing.[17] The determination of whether there has been a satisfaction of the terms of a "thereafter" clause depends on the surrounding facts in each case,[18] and ordinarily must be resolved by the trier of the facts.[19]

The Hervey No. 1 well was drilled into the Niles Sand on February 18, 1958, and encountered a "good blow" of gas. Cores were taken and drill stem tests made. The well was then deepened and on March 10, 1958, two days before the expiration of the primary term of the lease, commercial quantities of gas were discovered in the Upper Wade Sand. After the setting and cementing of casing, the well was cleaned out and perforated in the interval of the Niles Sand which was then acidized and sandfractured. This was completed on March 27, 1958. On April 2, 1958, the well had returned all the load oil used in the fracturing process and produced 3 barrels of

new oil. On a 24-hour test made the following day the well produced from the Niles Sand 14 barrels of oil and 225,000 cubic feet of gas. By July 24 the well had produced 434 barrels of oil. Production of oil from the Niles Sand then ceased. Between July 25 and August 3 the well was reworked and equipped as a dual producer of gas from both the Niles and Upper Wade Sands.

The trial court found that the production of oil from the Niles Sand produced a net profit to the working interest owners of $52.33 during the April 2–July 24 period and that this was production in paying quantities. The Whitakers contest this finding on the ground that in determining net profit no charge was made for depreciation and that if such charge had been made the operation would have shown a loss rather than a profit.

■■ The term "paying quantities" as used in oil and gas leases has a different meaning when applied to a habendum clause than it has when applied to express or implied covenants to drill additional or off-set wells.[20] This difference has been long recognized in Oklahoma. The obligation to drill additional wells or off-set wells is quite commonly dependent upon the production of oil and gas in paying quantities in a previously drilled well or in a well so situated with relation to leased premises that production may drain the leased premises. In such situations the term "paying quantities" is taken to mean such quantities as would lead a reasonably prudent operator to drill the additional or off-set well with the expectation of recovering from production the cost of drilling, equipping, and operating the well plus a reasonable profit.[21]

17. Woodruff v. Brady, 181 Okl. 105, 72 P. 2d 709, 711, 113 A.L.R. 391; Gypsy Oil Co. v. Marsh, 121 Okl. 135, 248 P. 329, 333, 48 A.L.R. 876.

18. Beatty v. Baxter, 208 Okl. 686, 258 P. 2d 626, 628.

19. Gallaspy v. Warner, Okl., 324 P.2d 848, 852; Ardizonne v. Archer, 72 Okl. 70, 178 P. 263, 264.

20. See discussion in 2 Summers, Oil and Gas, § 306, p. 334 et seq.

21. Ardizonne v. Archer, supra, 178 P. at pages 264–265; Pelham Petroleum Co. v. North, 78 Okl. 39, 188 P. 1069, 1072–1073; Keechi Oil & Gas Co. v. Smith, 81 Okl. 266, 198 P. 588, 589. In Knight v. Herndon Drilling Company, Okl., 296 P.2d 158, 164–165, it was said that this

When the term "paying quantities" is used in connection with the continuation of a lease under a "thereafter" clause, a different meaning is given. The Oklahoma rule is that when used in a habendum clause the term means paying quantities to the lessee and that "if the well pays a profit even though small, over operating expenses, it produces in paying quantities, though it may never repay its costs, and the operation as a whole may prove unprofitable."[22] The reason for the distinction is obvious. A party should not be obligated to drill a well unless there is a reasonable expectation of recoupment of investment with a profit for the venture. Once a well is drilled reasonable opportunity should be afforded to recover the sums risked. These principles were recognized by Oklahoma in Ardizonne v. Archer and Pelham Petroleum Co. v. North, both supra.

█ The difference between the two rules has a definite bearing on the question of whether depreciation is chargeable as an operation expense in the determination of whether oil was produced from the Hervey No. 1 well in paying quantities. Depreciation is an accounting charge for money spent in the acquisition of tangible property.[23] Under the Oklahoma decisions bearing upon the meaning of "paying quantities" as the term is used in a habendum clause, the criterion is whether the well pays a profit over operating expenses. This does not require the return, or any return, of the original investment. If the original investment is not to be considered, there is no reason for considering a depreciation charge based upon the acquisition cost of the tangible property making up a part of such investment.

█ Counsel for the Whitakers insist that a depreciation charge must be made on the physical property installed to secure production from the well. This is in a different category from original investment. It is in fact an operation cost as without it there can be no production. A proper depreciation charge on equipment installed to secure production may be made in the computation of profit or loss from such production. However, on the basis of the figures used by the Whitakers for such a depreciation charge, it is clear that for over a month the well made a profit after the deduction of such charge. It would serve no good purpose to review here the expert testimony with reference to production and costs. The answer is that the court below, as the trier of the facts, found that there was a period in which the well was operated at a profit and that this sufficed to bring into application the Oklahoma rule with reference to the meaning of "paying quantities" as used in the habendum clause. We cannot say that such finding was clearly erroneous. The conclusion based thereon accords with Oklahoma law.

█ Production of oil from the Hervey No. 1 well ceased on July 24 and had not been profitable for some time before that. The Whitakers contend that as the record shows no profitable production of oil from the Niles Sand after May 30, the lease, even if extended to that date, expired at that time. Such contention entirely overlooks the gas potential of the well. In Oklahoma a shut-in gas well capable of producing gas in paying quantities extends the term of the lease so long as reasonable diligence is used to obtain a market for the gas.[24]

The spacing unit involved has a gas reserve of 41,500,000 cubic feet in the Niles Sand. There was testimony that this can be produced at a profit when a

rule was never intended to take the element of risk entirely out of oil development.

22. Henry v. Clay, Okl., 274 P.2d 545, 546. See also Walden v. Potts, 194 Okl. 453, 152 P.2d 923, 924, and Denker v. Mid-Continent Petroleum Corporation, 10 Cir., 56 F.2d 725, 727.

23. Clifton v. Koontz, Tex., 325 S.W.2d 684, 692.

24. McVicker v. Horn, Robinson and Nathan, Okl., 322 P.2d 410, 413–414, 71 A.L.R.2d 1211; Panhandle Eastern Pipe Line Co. v. Isaacson, supra, 255 F.2d at pages 673–674; Bristol v. Colorado Oil & Gas Corporation, 10 Cir., 225 F.2d 894, 896.

market is obtained. In addition, the well is capable of producing 9,500,000 cubic feet daily from the Upper Wade Sand. The parties agree that the gas production from the Upper Wade is in paying quantities and that diligence has been used in obtaining a market.

The Whitakers say that reliance may not be had on Upper Wade gas production because the spacing order on the Upper Wade Sand was not entered until April 1, 1958, a date after the expiration of the primary term of the lease. While there is no Oklahoma decision bearing directly on this point, the reasoning in the Panhandle and Carter Oil cases is applicable. The lease was extended beyond the primary term by the Niles Sand production. During such extension the Upper Wade spacing order was made. In legal effect this placed the Upper Wade production on the Whitakers lease as of the date of the order. To hold otherwise would only confound confusion. The Upper Wade spacing order provided that the Hervey No. 1 well was the permitted well on the unit. This means that no other well could be drilled and that unless the royalty and working interest owners under the Whitakers lease may participate in the production of Upper Wade gas from the Hervey No. 1 well they lose their share of production therefrom. We agree with the trial court that the lease was extended after April 1 by the production secured in the Niles and is now held by the discovery of gas in paying quantities from the Upper Wade, such discovery in legal effect having occurred on the date of the Upper Wade spacing order.

The delay until August 3, 1958, in the completion of the well as a dual gas producer did not terminate the lease. The record convinces us that the operation of the Hervey No. 1 well was conducted in a diligent and prudent manner. After obtaining a show in the Niles the well was deepened to the Upper Wade [25]

where commercial production of gas was obtained. Thereafter appropriate methods were promptly used to obtain oil production from the Niles. This resulted in production of oil which was profitable for a time. Upon the cessation of that production the well was promptly reworked and completed as a gas producer from both the Niles and Upper Wade. The contention that the lease terminated upon the cessation of oil production from the Niles is without merit. The operator of the well prudently endeavored to exploit every possibility of production from the well with diligence and good faith. We are convinced that the Hervey No. 1 well satisfies the requirements of the "thereafter" clause of the lease.

Affirmed.

MURRAH, Chief Judge (concurring).

I agree that this case is ruled by Panhandle and, being bound by the ruling of that case as this court's expression of Oklahoma law, I must concur in the affirmance of the judgment. If I were free, however, to forecast Oklahoma law on the precise point, I should not hesitate to hold that the drilling of the well in question operated to extend the lease beyond its primary term only as to that portion which was included in the established spacing unit on which the well was drilled.

Concededly, the lease in question expired by its own terms for failure to commence a well on some part of it within the primary term, unless modified by operation of law. In this case we are brought to the extreme point of holding that a well commenced and drilled off the leasehold premises, but within a spacing unit which includes only a portion of the lease, operates to extend the primary term of the entire lease, even though the excluded portion may be properly included in other drilling units. We are constrained to this result because of dictum in the Kunc case to the effect that pooling of a portion of a leasehold does not

25. This did not constitute an abandonment of the Niles production. See Roach v. Junction Oil & Gas Co., 72 Okl. 213, 179 P. 934, 936; Parks v. Sinai Oil & Gas Co., 83 Okl. 295, 201 P. 517, 519.

operate to divide the lease into separate estates, and that a court of equity is therefore powerless to cancel the undeveloped portion not included in the drilling unit.

In Kunc, the lessee obtained timely production on a 320-acre lease. Thereafter, the Corporation Commission divided the north 160 acres into drilling or spacing units, including the producing well, but excluded the south 160 acres on which there was no production. The lessor sought cancellation of the lease as to the south 160 acres on the theory that production from a drilling unit containing only a portion of the leased land did not extend the primary term of the lease as to that portion outside the drilling unit. The Oklahoma court held that the pooling, by the Corporation Commission, did not have the effect of creating two leasehold estates, as contended by the lessor; that instead, timely production on the lease operated to extend the primary term "whether production is from the portion of the unit from the lease under consideration or from another portion of the unit." These latter words do ostensibly indicate that Oklahoma courts would hold with Panhandle, and that case was cited with apparent approval in State v. Carter, Okl., 336 P.2d 1086. The important fact remains, however, that Oklahoma has never gone so far as to hold that a well drilled off a leasehold estate, but within a drilling unit containing a portion of it, operates to satisfy the contractual requirements that a well be commenced on the lease within the term. I cannot bring myself to believe that it will do so.

Neither the conservation laws nor the police power of the state are involved in this case. There is no law, rule or regulation, the operation of which would interfere with, or serve to modify, the contract which the parties have made. In the absence of the supervening effect of any such law, rule or regulation I do not believe the courts are empowered to do so by judicial fiat.

Indeed, courts of equity have always been empowered to cancel the entire lease, or any portion of it, for failure to diligently develop, and to permit the lessee to continue to operate the developed portion. Gregg v. Harper-Turner, 10 Cir., 199 F.2d 1; Donaldson v. Josey Oil Co., 106 Okl. 11, 232 P. 821. There is nothing in the Kunc case to indicate that such powers are in any way affected by the hypothesis that spacing by the Corporation Commission does not operate to divide the leasehold estate. The legal effect of the Commission's spacing order and the equity powers of the court to cancel for nondevelopment, in cases like this, are in no way inconsistent. The courts are left to give full force and effect to the regulatory body's spacing orders, even to the point of validating a lease, or any portion of it, which is within an established drilling unit. I would sustain the traditional equity powers to cancel the undeveloped portion when, as here, the exercise of such powers are not incongruous with the Commission's orders.