291 F.2d 726
 J. P. ROGERS, Appellant,
v.
WESTHOMA OIL COMPANY, a corporation, Appellee (two cases).
A. L. HILBIG, Appellant,
v.
WESTHOMA OIL COMPANY, a corporation, Appellee.
Frank G. BOLES and Katie M. Boles, Appellants,
v.
WESTHOMA OIL COMPANY, a corporation, Appellee (seven cases).
Blanche ENGEL, Appellant,
v.
WESTHOMA OIL COMPANY, a corporation, Appellee (two cases).
Robert W. BAUGHMAN and Helen E. Baughman, his wife, Robert
W. Baughman, Oliver S. Brown and Guy E. Spear,
Executors and Trustees of the estate of
John W. Baughman, deceased, Appellants,
v.
WESTHOMA OIL COMPANY, a corporation, Appellee.
A. L. HILBIG and Esther Mae Hilbig, Appellants,
v.
WESTHOMA OIL COMPANY, a corporation, Appellee.
Lula DUNLAP, H. Harold Dunlap, Pearl Pitcher, Robert L.
Dunlap, Josephine Light, Marilyn E. Dunlap,
Catherine C. Dunlap and Charles M.
Light, Jr., Appellants,
v.
WESTHOMA OIL COMPANY, a corporation, Appellee (two cases).
Robert W. BAUGHMAN, Oliver Brown, and Guy E. Spear,
Executors of the estate of Ella Baughman,
deceased, Appellants,
v.
WESTHOMA OIL COMPANY, a corporation, Appellee.
Goldie B. DUBOIS, Appellant,
v.
WESTHOMA OIL COMPANY, a corporation, Appellee.
Alice Marjorie McGILL and Sherley McGill, Appellants,
v.
WESTHOMA OIL COMPANY, a corporation, Appellee.
Paul R. PACKER, Appellant,
v.
WESTHOMA OIL COMPANY, a corporation, Appellee.
Etta HAWK, Appellant,
v.
WESTHOMA OIL COMPANY, a corporation, Appellee.
Orville BELILE and Helena L. Belile, Appellants,
v.
WESTHOMA OIL COMPANY, a corporation, Appellee.
N. G. MORLAN and Okel E. Morlan, Appellants,
v.
WESTHOMA OIL COMPANY, a corporation, Appellee.
E. D. HAMPTON and Flora Hampton, Appellants,
v.
WESTHOMA OIL COMPANY, a corporation, Appellee.
Merle W. BLOOM, Mldred L. Bloom, Nellie J. Vail, L. A.
Bloom, Mildred C. Bloom, Edna E. Headrick, Roy W.
Headrick, Wilma A. Keating and James B.
Keating, Appellants,
v.
WESTHOMA OIL COMPANY, a corporation, Appellee (two cases).
Joseph A. HANLIN, Francis B. Hanlin, Mary J. Brewington and
Ray Brewington, Appellants,
v.
WESTHOMA OIL COMPANY, a corporation, Appellee.
 Nos. 6522-6548.
 United States Court of Appeals Tenth Circuit.
 May 4, 1961, Rehearing Denied July 11, 1961.
 
 Dale M. Stucky and Wayne Coulson, Wichita, Kan. (Auburn Light, James R. Yoxall, Liberal, Kan., Paul R. Kitch, Donald R. Newkirk, Robert J. Hill Gerrit H. Wormhoudt and Robert T. Cornwell, Wichita, Kan., and Light & Light, Liberal, Kan., Hugo T. Wedell and Homer V. Gooing, Wichita, Kan., of counsel, on the brief), for appellants.
 John F. Eberhardt, Wichita, Kan. (George B. Powers Carl T. Smith, Stuart R. Carter, Robert C. Foulston, Malcolm Miller, Robert N. Partridge, Robert M. Siefkin, Richard C. Harris and Gerald Sawatzky, Wichita, Kan., on the brief), for appellee.
 Elmer W. Adams, Tulsa, Okl., Lynn Adams, Oklahoma City, Okl., G. D. Ashabranner, George H. Bowen, Cecil R. Buckles, Angus A. Davidson, Glenn R. Davis, J. Paul Greve, Howard H. Harris, Tulsa, Okl., Coleman Hayes, S. D. Holloway, Oklahoma City, Okl., Robert A. Huffman, Hawley C. Kerr, Tulsa, Okl., Gentry Lee, Bartlesville, Okl., William E. Lester, Tulsa, Okl., Richard R. Linn, Oklahoma City, Okl., James H. McGowan, Tulsa, Okl., R. O. Mason, L. G. Minter, Bartlesville, Okl., Robert W. Richards, Oklahoma City, Okl., Richard P. Ryan, Tulsa, Okl., Nathan Scarritt, Enid, Okl., Norton Standeven, Oklahoma City, Okl., Leslie A. Thompson, H. B. Watson, Jr., Philip R. Wimbish, Tulsa, Okl., John W. Wolfe, Oklahoma City, Okl., and Wm. J. Zeman, Bartlesville, Okl., amici curiae.
 Before MURRAH, Chief Judge, and BRATTON and BREITENSTEIN, Circuit judges.
 BREITENSTEIN, Circuit Judge.
 
 
 1
 These 27 consolidated appeals are from separate judgments entered in declaratory judgment actions brought by lessors or their successors to determine whether the oil and gas leases involved had terminated as to all horizons below sea level at the expiration of their respective primary terms because of failure to obtain production. They present a common question of law bearing on similar and undisputed facts. Twenty-four of the actions were removed from Kansas state courts and three were filed originally in federal court. There is unquestioned diversity jurisdiction. The parties, agreeing that there were no factual issues, each moved for summary judgment and the lower court held that the leases had all been continued beyond their primary terms by gas production secured within those terms from horizons above sea level. The lessors have appealed.
 
 
 2
 The 27 leases cover land in the Hugoton Field, Seward County, Kansas, and were identical in form, differing only as to date, lessor or lessors, and land descriptions. Twenty-four were executed during 1941 and 1942 and three in 1944. Each was for a 10-year primary term. By mesne assignments Plains Natural Gas Company (Plains) became the owner of the leases as to all horizons above sea level and appellee-defendant Westhoma Oil Company (Westhoma) became the owner of the leases as to all horizons below sea level. No question is raised as to the validity of these assignments on the basis of horizontal divisions.
 
 
 3
 The Kansas Corporation Commission by proration order established 640 acres as the basis for computing allowables in the Hugoton Field.[1] In an appropriate manner, Plains acted to consolidate its holdings into 640-acre units. The statement accomplishing this purpose provided that:
 
 
 4
 '(A) 11 producing horizons which are situated above and down to, but not below, the sea level, shall be deemed, treated and operated as a consolidated gas leasehold estate.'Within the primary term of each lease Plains secured commercial gas production from above-sea-level horizons on each of the consolidated units. As to 9 of the leases the producing well is on the leased land and as to 18 the well is located elsewhere on the unit involved. No production of oil or gas was obtained during the primary terms from below-sea-level horizons.
 
 
 5
 Each lease contained a 'thereafter' clause which will be discussed later. Ordinarily an oil and gas lease is extended beyond the primary term by a 'thereafter' clause if a producing well is obtained at any location on the leased premises during the primary term.[2] None of the parties question the general rule that production from any part of a consolidated or pooled unit perpetuates all leases within the unit, even as to ununitized acreage, unless the leases provide to the contrary.[3] Each lease in question also contains what is called a 'Pugh clause'[4] which is designed to prohibit lease continuation beyond the primary term as to nonproducing areas not included within a productive unit.
 
 
 6
 The habendum clauses of the leases provide a term of 10 years and as long thereafter as oil or gas is produced from the premises 'and as long as hereinafter otherwise provided in the event of consolidation.'[5] The parties agree that the occurrence of production on or off the leased premises included within a unit makes no difference in the disposition of the controversy and that the 'hereinafter otherwise provided' clause controls because there was consolidation. In these circumstances, this court is not concerned with what the situation might be in the absence of such an agreement.
 
 
 7
 The Kansas Supreme Court has established rules which govern the construction and application of oil and gas leases in that state. In Tate v. Stanolind Oil & Gas Co., 172 Kan. 351, 240 P.2d 465, 468-469, it is said that the intent of the parties is the primary question; that reasonable rather than unreasonable interpretations are favored; that meaning should be ascertained by consideration of all pertinent provisions rather than 'by a critical analysis of a single or isolated provision'; that in the event of ambiguity or uncertainty consideration must be given to 'the instrument as a whole, the object sought to be obtained, and other circumstances, if any, which tend to clarify the real purpose and intent of the parties'; and that a practical and equitable construction must be given to ambiguous terms. We must decide the cases on the basis of the instruments before us and the Kansas law.
 
 
 8
 The trial court held that the Pugh clauses were written in 'surface sounding terms' and do not 'specifically or clearly designate underground horizons' and concluded that the provisions of the Pugh clauses terminating the leases at the end of the primary terms as to ununitized nonproducing portions apply only to 'partial unitization of less than all of the surface acreage covered by the leases.' As all the surface acreage was unitized, and as there was production from each unit, the decision was that the leases were continued beyond the primary terms as to all horizons.
 
 
 9
 Admittedly, the Pugh clauses apply to vertical divisions of the leased premises. The query is whether they apply to horizontal divisions. In determining the issue we are aided by no decisions which are directly in point. Broussard v. Phillips Petroleum Company, supra, and Humble Oil & Refining Co. v. Hutchins, 217 Miss. 636, 64 So.2d 733, 65 So.2d 824, relied on by lessors, are not helpful as each concerned the application of a Pugh clause to a vertical rather than a horizontal division. Westhoma relies on Martin v. Texas Gulf Producing Co., 223 Miss. 872, 79 So.2d 270, involving a lease which did not contain a Pugh clause. The court there rejected the contention that failure to drill below a horizon which had been unitized and from which production had been obtained off the leased premises but within the unit terminated the lease. White v. Frank B. Treat & Son, 230 La. 1017, 89 So.2d 883, also cited by Westhoma, was concerned with a mineral servitude rather than a lease and held that production from a unitized zone continued the servitude as to all zones. No Kansas decisions bearing on the specific point have been brought to our attention.
 
 
 10
 Under the Pugh clauses the lessee is authorized to consolidate the leasehold estate, 'or any part or part thereof,' with the mineral leasehold estate, 'or parts thereof,' in other lands upon which the lessee at the time has a valid lease. The consolidation is limited to include not more than 2,560 acres. The lengthy and technical arguments as to whether the word 'part' is confined to vertical divisions on the basis of surface acreage or also encompasses horizontal divisions on the basis of depth can be simply resolved. The ordinary practice is to confine consolidations to a formation or pool which constitutes a known common source of supply.[6] In situations where there is more than one source or pool underlying the same land[7] a comprehensive consolidation from the surface to the center of the earth carries with it the potential of grievous complications if different geographical units are established for different producing formations.[8] The leases contain no prohibition against the recognized practice of consolidating in terms of sources of supply, pools, or depth. The parties recognize the validity of the partial assignments to Plains and Westhoma with division on the basis of depth. Plains could not consolidate the entire leasehold estate as it did not own that portion below sea level. In the situations presented it is our opinion that 'part' as used in the consolidation authorization includes both horizontal and vertical divisions.
 
 
 11
 The Pugh clause lease continuation provisions are found in subparagraph 9(a) which reads that in the event of consolidation the lease shall be continued 'as to the premises covered hereby and included in any such consolidation of estates' by a producing gas well located on a consolidated unit or by oil production from a well on leased land.
 
 
 12
 Lease termination is covered by subparagraph 9(b) of the Pugh clause which states that the lease terminates at the expiration of the primary term as to any 'tract or tracts not included in a consolidation held in force by production' unless there is production in accordance with other lease terms.
 
 
 13
 Consistency between 9(a) and 9(b) requires that 'premises' as appearing in 9(a) and 'tract or tracts' as appearing in 9(b) be given the same meaning. We deem it unnecessary to engage in a semantic analysis of the technical implications of the quoted terms. Definitions can be found which confine those terms to surface application and other definitions give them such generality of meaning as to include both surface and subsurface rights. It is enough that consolidation may be on the basis of horizontal as well as vertical divisions and the consolidation here made includes only that portion of the leasehold estate which is above sea level. The portion below sea level was not consolidated and hence is not within the purview of 9(a) and the continuation provisions of that subparagraph do not apply. By the same reasoning the termination provisions of 9(b) are applicable and terminate the leases as to the below-sea-level horizons at the end of the primary term because there was no production therefrom during that term.
 
 
 14
 To avoid this conclusion Westhoma argues that the lease provisions for delay rentals and minimum gas royalties are stated in terms of surface acres, that the lease must be considered in its entirety, and that the inapplicability of the delay rental and minimum gas royalty provisions to horizontal divisions requires the conclusion that consolidations must likewise be treated solely from the standpoint of surface acres. As we are not concerned with delay rentals or royalties, the provisions in regard thereto are pertinent only so far as they bear on intent and for such purpose we find them without persuasive effect. Delay rentals are specifically mentioned in 9(b) and, as has been shown, that subparagraph ends the leases at the expiration of the primary term as to unconsolidated unproductive tracts. Provision for rental on an acreage basis does not mean that the parties intended lease continuation for that part of the leasehold estate which was without a consolidation and which was unproductive.
 
 
 15
 Problems relating to minimum royalties payable on an acreage basis obviously can cause complications in the event there is production from more than one horizon but those complications will occur regardless of whether the lease is divided on a horizontal basis. Granting that in hypothetical situations difficulty might arise over the rent and royalty provisions, the fact remains that bothersome lease provisions of uncertain meaning and application are of little help in determining the meaning of other lease provisions.
 
 
 16
 Westhoma emphasizes the indivisibility of the express and implied covenants of a single oil and gas lease.[9] The liabilities of lessee and his assignee are not altered by any division which the lessee may make of his interests,[10] but that rule has no effect here. The separation of the lease into two parts with the lease continuing as to the upper horizons and terminating as to the lower horizons results from the application of lease terms. There is nothing to prevent parties from agreeing that a lease may be separated under certain conditions. The argument that the conclusion reached imposes additional requirements to keep the lease alive is unimpressive. Under the Pugh clauses if there were vertical consolidations of less than all lease acreage, there would be the additional requirement of drilling and obtaining a producing well on the unconsolidated area. The fact that the result also ensues from a horizontal consolidation does not make the Pugh clauses any less effective when there is a horizontal rather than a vertical consolidation. The same requirements apply to each.
 
 
 17
 We must arrive at the intent of the parties. The Pugh clauses are for the protection of the lessors to prevent lease continuation as to ununitized portions which are nonproducing. We find nothing in the leases which confines the application of the Pugh clauses to surface areas and vertical divisions. It is common knowledge that leases are divided both vertically and horizontally and that unitization is ordinarily on the basis of a common source of supply. While the inclusion of all surface areas in consolidations protects lessors from the hardships resulting, in the absence of a Pugh clause, from partial vertical consolidation, recognition of this fact does not solve the problem. A lease can provide for protection against continuation both of unconsolidated vertical divisions and of unconsolidated horizontal divisions. Considering these leases as a whole, we believe that a reasonable interpretation requires the conclusion that it was the intent of the parties to prohibit lease continuation as to unproductive portions without a consolidation whether such portions were the result or horizontal or vertical divisions. As the below-sea-level horizons were not included within any consolidations and as there was no production therefrom, the leases terminated as to such horizons at the end of the primary period.
 
 
 18
 In Nos. 6522 to 6548, inclusive, the judgments are severally reversed with directions to enter judgments for the plaintiffs cancelling the leases so far as below-sea-level horizons are concerned.
 
 
 19
 On Petition for Rehearing.
 
 
 20
 BREITENSTEIN, Circuit Judge.
 
 
 21
 With the court's permission, 28 lawyers have joined in an amici curiae brief supporting the appellee's petition for rehearing. Among other things, they attack the holding that the Pugh clauses were for the protection of the lessors. They point out that all of the leases in question were executed during World War II and say that the Pugh clauses were to permit the consolidation necessary to accommodate the leases to an order of the Office of Production Management limiting the availability of certain materials to gas wells drilled on a pattern of 1 to 640 acres.[11] The point is not well taken because 7 of the leases were executed before December 23, 1941, the date of that order. The parties tried the cases and presented the appeals on the basis that there were no facts distinguishing any one lease from the others. The mentioned order could not have influenced the drafting of leases issued prior thereto.
 
 
 22
 The opinion of the court is said to be a departure from the prudent-operator rule. No such departure was either intended or made. The prudent-operator rule imposes on a lessee the implied duty to do whatever in the circumstances would be reasonably expected of a prudent operator of a particular lease, having rightful regard for the interest of both the lessor and the lessee.[12] Ordinarily, the prudent-operator rule comes into play in connection with a claim of breach of the implied covenant for further development. We have no such situation here as these consolidated cases involve the question of lease termination at the expiration of the primary term. They do not involve any claimed breach of the implied covenant for further development. Counsel for Westhoma have explicitly recognized in their briefs the rule laid down in Panhandle Eastern Pipe Line Company v. Isaacson, 10 Cir., 255 F.2d 669, and Whitaker v. Texaco, Inc., 10 Cir., 283 F.2d 169, that production from a unit which contains a part of the leasehold estate continues the entire lease beyond the primary term in the absence of countervailing lease provisions. They concede that the Pugh clauses have the effect of abrogating this rule so far as vertical divisions are concerned but they say that this result does not follow as to horizontal divisions. The holding of the court applies the Pugh clauses to both vertical and horizontal divisions and gives those clauses the effect of abrogating the Whitaker and Panhandle rule as to the entire leasehold estate.
 
 
 23
 In the case at bar if there had been no consolidation, production of oil or gas from above-sea-level horizons would have continued the lease or leases in connection with which such production was obtained as to all horizons within the vertical boundaries but the lessee would be under the obligation of the implied covenant of further development.[13] The parties agree that the continuation of the leases beyond the primary term is controlled by the Pugh clauses. By their terms these clauses operate to continue the leases beyond the primary term by gas production only as to the partes thereof within a consolidation. Diverse ownership made the consolidation of the below-sea-level horizons with above-sealevel horizons impossible.
 
 
 24
 Counsel for Westhoma insist that the opinion of the court places an unreasonable interpretation on the leases because no rational purpose can be accomplished by applying the Pugh clauses to ununitized horizontal divisions. We disagree. An important purpose of the Pugh clauses when considered in connection with vertical divisions is to prevent lease continuation beyond the primary term as to unproductive areas not included within a unit and to obviate the necessity of an action for breach of the implied covenant to develop further in order to terminate the lease as to such areas.[14] Exactly the same reason applies so ar as horizontal divisions are concerned.
 
 
 25
 The amici object to the application of subsurface meaning to the word 'part' and analyze the use of that word in the leases. In so doing they fail to mention paragraph 10 providing for lease asignment 'in whole or in part' and disregard the fact that the parties admit the validity of the partial assignments to Plains and Westhoma on the basis of horizontal divisions.
 
 
 26
 The petition for rehearing is denied.
 
 
 27
 BRATTON, Circuit Judge, would grant the petition for rehearing and affirm the judgment.
 
 
 28
 BRATTON, Circuit Judge (dissenting).
 
 
 29
 Section 2 in each of the several leases provides in conventional form that the lease shall remain in force and effect for a term of ten years from the date of its delivery and as long thereafter as oil, gas, or other minerals are or can be produced from any well 'on said premises and as long as hereinafter provided in the event of consolidation.' Section 9 expressly authorizes consolidation of the leasehold estate 'or any part or parts thereof' with other leaseholds owned by the lessee. And it further provides in effect that after consolidation, the lease shall continue in force and effect so long as gas is or can be produced from any well 'located on any part of the land included in such consolidation (whether on lands covered hereby or not), except as herein otherwise provided, or so long as oil is or can be roduced from any well drilled on a portion of the land covered hereby.' In short, each lease provides that it shall be continued beyond the primary period by production as therein specified during such primary period.
 
 
 30
 But the leases do not speak of horizons. They make no reference in specific language to production from one horizon perpetuating or failing to perpetuate the leases in respect to another horizon. They are silent in respect to partial unitization or consolidation of horizontal structures. They say nothing concerning depths, levels or stratums. They are completely silent as to such terminology. Viewed as a whole, and given a reasonable interpretation, the leases fail to indicate persuasively that at the time of their execution, the parties lessor and lessee were thinking in terms of subsurface separation or segregation of mineral rights by levels, horizons or stratums, in respect to production from one level or horizon failing to continue the leases beyond the primary period in respect to another level or horizon. Instead, they say in general language that production during the period shall continue their existence in force and effect beyond the termination of the primary period. They do refer to consolidation of any part or parts of the leasehold premises. But that reference is to surface separation or division by vertical segregation. It does not refer to subsurface segregation by depth, level, stratum, or horizon. And in the absence of an express provision in the leases relating to production from one level or horizon during the primary period failing to perpetuate the leases in respect to another level or horizon, production during the primary period from a horizon above sea level had the effect of perpetuating beyond the primary period the leases in their entirety. Cf. Martin v. Texas, Gulf Producing Co., 223 Miss. 872, 79 So.2d 270; White v. Frank B. Treat & Son, 230 La. 1017, 89 So.2d 883.
 
 
 31
 It is my view that the judgments should be severally affirmed.
 
 
 
 [1]
 The Commission order is not set out in full in the record but it apparently affected only gas production from above-sea-level horizons. It is so treated by the parties
 
 
 [2]
 Cowman v. Phillips Petroleum Co., 142 Kan. 762, 51 P.2d 988, 991
 
 
 [3]
 Whitaker v. Texaco, Inc., 10 Cir., 283 F.2d 169; Panhandle Eastern Pipe Line Company v. Isaacson, 10 Cir., 255 F.2d 669; McCammon v. Texas Company, D.C.Kan., 137 F.Supp. 256; 2 Summers Oil & Gas, Perm.Ed., 302.1, pp. 293-294 and cases cited in note 98.15
 
 
 [4]
 Cf. Broussard v. Phillips Petroleum Company, D.C.La., 160 F.Supp. 905, 907, affirmed per curiam on basis of opinion below, 5 Cir., 265 F.2d 221
 
 
 [5]
 In each lease the habendum clause reads thus: 'This lease shall remain in force and effect for a term of ten (10) years from the date of its delivery (hereinafter sometimes called the 'primary term') and as long thereafter as oil, gas, or other minerals are or can be produced from any well on said premises and as long as hereinafter otherwise provided in the event of consolidation.'
 
 
 [6]
 Hoffman, Pooling and Unitization Clauses in Oil Leases, 1 Rocky Mountain Mineral Law Institute, pp. 107-108; Summers, supra. Vol. 3, 553.1; cf. Carter Oil Co. v. McCasland, 10 Cir., 190 F.2d 887. See 1959 Supp. to G.S.Kan.1949 55-603 and 55-703 which respectively empower the state corporation commission to regulate the taking of oil from any pool and of gas from any common source of supply
 
 
 [7]
 Cf. Whitaker v. Texaco, Inc., supra, 283 F.2d at pages 176-177
 
 
 [8]
 Hoffman, supra
 
 
 [9]
 Cf. Wilson v. Texas Company, 147 Kan. 449, 76 P.2d 779, 783
 
 
 [10]
 Summers, supra, Vol. 3, 512, p. 403
 
 
 [11]
 Conservation Order M-68, 6 Fed.Reg. 6687
 
 
 [12]
 Sun Oil Company v. Frantz, 10 Cir., 291 F.2d 52
 
 
 [13]
 In saying this we are neither overlooking nor determining the effect of lease paragraph 16 which reads: 'Lessee shall be under no obligation, express or implied, to drill more than one well upon the consolidated lease hold for the production of gas, regardless of when, where, or by whom offset wells may be drilled, provided nothing herein shall prevent lessee from drilling as many wells as it may desire.' This has no application to oil production or to unconsolidated portions such as the below-sea-level horizons
 
 
 [14]
 In Whitaker and Sun Oil, both supra, it was pointed out that lease continuation beyond the primary term resulting from production on a unit containing part of the leased premises was subject to compliance with the implied covenant to further develop. The Sun Oil case was an action to forfeit for breach of that coverant