STATE of Oklahoma ex rel. COMMISSIONERS OF THE LAND OFFICE of Said State, Plaintiff in Error,

v.

CARTER OIL COMPANY OF WEST VIRGINIA, a Corporation, Defendant in Error.

No. 37895.

Supreme Court of Oklahoma.

Dec. 9, 1958.

Rehearing Denied Jan. 27, 1959.

Application for Leave to File Second Petition for Rehearing Denied March 31, 1959.

R. H. Dunn, A. M. DeGraffenried, N. A. Gibson, Oklahoma City, for plaintiff in error.

Forrest M. Darrough, Varley H. Taylor, Jesse H. Foster, Jr., Tulsa, LaMar & Bailey, Guymon, Monnet, Hayes & Bullis, Oklahoma City, for defendant in error.

CORN, Vice Chief Justice.

The Commissioners of the Land Office, composed of the Governor, Secretary of State, State Auditor, Superintendent of Public Instruction and the President of the Board of Agriculture are charged with the sale, rental, disposal and management of the school lands and other public lands of the State. 64 O.S.1951 § 1.

64 O.S.1951 § 281 authorizes the lease of such lands for oil and gas and provides:

"The Commissioners of the Land Office are authorized to lease for oil and gas purposes any of the school or other lands owned by the State of Oklahoma, which such commissioners may deem valuable for oil and gas, for the term of five years and as long thereafter as

oil and gas may be produced therefrom in paying quantities, upon such terms and conditions and in such quantities as the commissioners shall by rules and regulations prescribe. * * * "

64 O.S.1951 § 92 also authorizes the sale of oil and gas leases by the commissioners.

The State of Oklahoma is the owner of the following described land situated in Beaver County, State of Oklahoma, to-wit: The S½ (Southeast Quarter (SE/4) and the Southwest Quarter (SW/4)) of Section 16, Township 5 North, Range 25 ECM.

On the 11th day of April, 1950 the Commissioners sold to H. A. Baker two oil and gas leases thereon, one covering the SE/4 and one covering the SW/4 thereof.

Except for the description of the land the leases are identical in terms. Such leases provide in part as follows:

"This Indenture of Lease, Made and entered into in duplicate, on this the 11th day of April, A.D. 1950, by and between the Commissioners of the Land Office of the State of Oklahoma, acting for and in behalf of the State of Oklahoma, parties of the first part, hereinafter designated as lessor, and H. A. Baker, 816 Citizens Bank Building, Tyler, Texas, party of the second part, hereinafter designated as lessee, under and in pursuance of the provisions of the Constitution and Laws of the State of Oklahoma, relating to the segregation of the oil and gas deposits and leasing thereof on school and other public lands belonging to the State of Oklahoma, Witnesseth:

"1. The lessor, for and in consideration of Three Hundred Forty and no/100 ($340.00) Dollars, the receipt whereof is hereby acknowledged, and of the royalties, covenants, stipulations and conditions hereinafter contained and hereby agreed to be paid, observed and performed by the lessee, and his lawful assigns; does hereby demise, grant, lease, and let unto the lessee for the term of five years from the date hereof, and as long thereafter as oil or gas or either of them is produced in paying quantities, and all the oil deposits and natural gas in or under the following described tract of land lying and being within the County of Beaver, in the State of Oklahoma, to-wit: SE/4 of Section 16, 5N 25ECM., and containing 160 acres, more or less, with the exclusive right to prospect for, extract, pipe, store and, remove oil and natural gas, and to occupy and use so much only of the surface of said land as may reasonably be necessary to carry on the work of prospecting for, extracting, piping, storing and removing such oil, distillate and natural gas. Also the right to obtain from wells or other sources on said land by means of pipe lines or otherwise, a sufficient supply of water to carry on said operations, except the private wells or ponds of the surface owner or lessee, and also the right to use, free of cost, oil and natural gas or fuel so far as necessary to the development and operation of said property."

* * * * * *

"It being understood that the completion of one well producing oil or gas in paying quantities during the life of this lease, shall relieve the lessee of all future liability for said $1.00 per acre hereunder, but the lessee shall nevertheless remain obligated to drill an offset, or necessary offsets, and other wells necessary to the proper development and operation of said lease as herein otherwise provided, until the lease is fully developed; and provided further that unless a producing well in paying quantities of oil or gas is completed on the above described premises within five years from the date hereof this lease shall be void."

* * * * * *

10. "This lease shall be subject to the constitution and laws of the State of Oklahoma and the rules and regulations of the Commissioners of the Land Office now or hereafter in force relative to such lease; all of which are

made a part and condition of this lease; Provided, That no regulations made after the execution of this lease affecting either the length of the term hereon, the rate of royalty, or payment hereunder or the assignment hereof, shall operate to affect the terms and conditions of this lease."

\* \* \* \* \* \*

13. "Upon the violation of any of the substantial terms or conditions of this lease, the Commissioners of the Land Office shall have the right, at any time after hearing upon ten days notice, given by registered mail to the last known address of such lessee, or by posting notice in writing in a conspicuous place upon the premises, specifying the terms or conditions violated, to declare this lease null and void; and the said Commissioners for and on behalf of the State of Oklahoma, shall be entitled to recover from the lessee's bondsmen, all rents, royalties, charges, claims of every kind and nature due and owing and accruing and arising out of and by reason of this lease, on failure to comply with the provisions thereof, and the lessors shall be entitled and authorized to take immediate possession of the land. \* \* \*"

The Commissioners consented to the assignment of both leases as provided by law and The Carter Oil Company became the owner thereof.

On the 8th day of December, 1954 the Corporation Commission of Oklahoma entered an order fixing 640 acre drilling and spacing units for the production of natural gas from the Morrow Sands which order included all of Township 5 North, Range 25 East, Beaver County, Oklahoma.

On the 17th day of January, 1955, the Corporation Commission of Oklahoma entered an order fixing 640 acre drilling and spacing units for the production of natural gas from the Chester Lime common source of supply underlying Section 16 and other Sections in Township 5 North, Range 25 ECM, Beaver County, Oklahoma.

The Texas Company is the owner of oil and gas lease covering the North half of said Section 16. The lease is dated February 26, 1954 and is "for a term ending February 26, 1955, and as long thereafter as oil, gas, casinghead gasoline, or any of them is produced." It contains a shut-in gas clause which provides:

"Where gas from a well or wells, capable of producing gas only, is not sold or used for a period of one year, lessee shall pay or tender as royalty, an amount equal to the delay rental as provided in paragraph (5) hereof, payable annually at the end of each year during which such gas is not sold or used, and amount equal to the delay rental as provided in paragraph (5) hereof, payable annually at the end of each year during which such gas is not sold or used, and while said royalty is so paid or tendered this lease shall be held as a producing property under paragraph numbered two hereof."

The provisions thereof make it what is termed a "commence" lease, that is, a well may be commenced within the primary term and completed after the expiration thereof.

The State leases are "completion" leases. In other words, to comply therewith the well must have been completed within the primary term to extend the lease.

On the 26th day of October, 1954, The Carter Oil Company and the Texas Company entered into an operating agreement with The Carter Company as operator, whereby said Section 16 was to be developed as a unit and as to the marketing of the product, Section 14 thereof provides:

"Each of the parties hereto shall take in kind or separately dispose of his or its proportionate share of the oil and gas produced from the premises exclusive of production which *mat* be used in development and producing operations on said premises and in preparing and treating oil for marketing

purposes and production unavoidably lost, and shall pay or cause to be paid all applicable royalties thereon. Any extra expenditure incurred by the taking in kind or separate disposition by any party hereto of his or its proportionate share of the production shall be borne by such party. Each party hereto shall be entitled to receive directly payment for his or its proportionate share of the proceeds from the sale of all oil or gas produced, saved and sold from said premises, and on all purchases or sales, each party shall execute any division order or contract of sale pertaining to his or its interest. In the event any party hereto shall fail to make the arrangements necessary to take in kind or separately dispose of his or its proportionate share of the oil or gas produced from said premises, operator shall have the right, subject to revocation at will by the party owning same, to purchase such oil and gas or sell the same to others for the time being at not less than the market price prevailing in the area and not less than the price which operator receives for its own portion of such oil or gas, any such purchase or sale to be subject always to the right of the owner of such oil or gas to exercise, at any time, his or its right to take in kind or separately dispose of his or its share of such oil or gas not previously delivered to a purchaser pursuant hereto."

Sections 26 and 27 of such operating agreements are as follows:

26. "The Carter Oil Company, as Operator, is hereby authorized to commence on or before December 1, 1954, a well on the SE SE NW of Section 16–5N–25ECM, and pursue the drilling thereof to a depth sufficient to test the Chester formation, expected to require drilling to approximately 7,-000 feet."

27. "In the event the well provided for in section 26 hereinabove is completed:

"(a) As a gas well, this operating agreement shall be limited to the gas rights only underlying the land described in section 2 on page 1:

"(b) As an oil well, this operating agreement shall cover oil and gas rights underlying the SE NW and the NE SW of Section 16–5C–25ECM, Beaver County, Oklahoma and Section 2 on page 1 shall be amended to cover said 80 acre tract. Exhibit "A" to this agreement shall be amended to show the SE NW as being a full interest lease contributed by The Texas Company, and the NE SW as being a full interest lease contributed by The Carter Oil Company."

The well, as provided for therein, was completed as a gas well prior to April 11, 1955, the date on which the primary term of the state leases expired. However, no gas was marketed prior to that date.

On the 6th day of February, 1956 the State of Oklahoma ex rel. Commissioners of the Land Office brought an action against The Carter Oil Company setting up both leases and the assignment thereof to the Carter Oil Company, and alleging that said company had conducted no drilling operations upon said lease premises prior to the expiration of five years from the date thereof, and that by reason thereof both leases had expired; that the defendant was claiming said leases. It prayed it be determined that both leases had expired and the title be quieted as against said Carter Oil Company.

The answer of The Carter Oil Company denied generally all allegations of the petition except such as were specifically admitted. It admitted it had acquired the two leases in question and then alleged that by order of the Corporation Commission this drilling and spacing unit for gas of 640 acres was established; that The Texas Company owned the oil and gas lease on the north half of the section in question; that it entered into an operating agreement with The Texas Company, with defendant as operator; that a well producing gas in

paying quantities was completed on the unit prior to the expiration of the term of its leases from the Commissioners; that there was no pipe line in the area and it was impossible to market the gas; that it exercised the utmost diligence in seeking a market; that it did obtain a market therefor, having executed gas sales contract on March 19, 1956; that it has fully performed and discharged its duties, obligations and covenants and that its leases are in full force and effect.

It then prayed that its leases be determined to be valid and subsisting.

The reply was in the nature of a general denial. The Commissioners then denied that due diligence in seeking market is a defense and alleged that said leases contained a "completion clause" and that said leases do not contain a shut-in gas clause. The trial resulted in a judgment in favor of the defendant, The Carter Oil Company. The State of Oklahoma ex rel. Commissioners of the Land Office appeal.

The term for which the Commissioners can execute oil and gas leases on such public land is fixed by 64 O.S.1951 § 281, which is a "term of five (5) years and as long thereafter as oil or gas may be produced * * * in paying quantities". In view of said Section 281, the Constitution and Enabling Act, the position is taken that there is no authority permitting the commissioners to execute an oil or gas lease which permits the extension of the primary term thereof in the absence of production in paying quantities; that their authority in that respect is limited thereby.

The State of Oklahoma accepted all grants of land made by the United States under the provisions of the Enabling Act, Const. Art. 11, Section 1.

Section 8 of the Enabling Act provides that such land may be leased for oil and gas for periods not exceeding five years, setting forth the minimum terms for which such land could be leased with provision that the legislature may prescribe additional legislation governing such leases not in conflict therewith. Haskell v. Haydon, 33 Okl. 518, 126 P. 232.

Consistent therewith 64 O.S.1951 § 281, supra, authorizes the Commissioners of the Land Office to lease school lands for oil and gas for the term of five years and as long thereafter as oil or gas may be produced therefrom in paying quantities. It then prescribed additional conditions as to the minimum royalty interest, the time and nature of notice and manner of bidding. In addition it provides that the same should be leased "upon such terms and conditions and in such quantities as the commissioners shall by rules and regulations prescribe."

■ Under such authority the commissioners adopted the lease form and prescribed rules and regulations for the sale of oil and gas leases on such lands. The terms of the lease form, as well as the rules and regulations prescribed more than meet the minimum requirements of section 281, supra.

Both leases in question provide that they are for a term of five years from the date thereof and as long thereafter as oil or gas or either of them "is produced in paying quantities."

■ "May be" as used in the statute connotes the possibility of production in paying quantities. Webster's International Dictionary. In other words the minimum statutory requirement prescribed would be in effect, the capability to produce oil or gas in paying quantities within the primary term.

"Is" ordinarily means an objective fact. Websters International Dictionary. Thus it is apparent that in prescribing in the lease "as long thereafter as oil or gas is produced therefrom in paying quantities" the commissioners went beyond the minimum statutory restrictions hereinbefore detailed.

This being true and further since this provision "as long thereafter as oil or gas is produced in paying quantities" is in common usage in commercial oil and gas leases, it is necessary to look to our decisions involving such commercial leases and determine what we have held to be the meaning thereof, the commissioners' lease

never having been before this court in regard thereto.

In this connection the commissioners contend that by virtue of the terms of the leases they are "completion" leases; that the terms are clear and unambiguous; and that to extend said leases beyond their primary terms not only must there be a completed well thereon, but the production must be marketed in paying quantities prior to the expiration of said primary term.

Conversely The Carter Oil Company contends that it having completed a well capable of producing gas in paying quantities before the end of the primary term, and having diligently sought and obtained a market therefor, the leases were extended thereby notwithstanding the fact that actual sales and deliveries of the gas did not commence until after the end of the primary term.

Actually there is no disagreement as to any of the facts. It was stipulated that a well capable of producing gas in paying quantities was completed on the drilling unit prior to the expiration date of both leases, April 11, 1956. It is unquestioned that there was no pipe line connection prior to that date and that no gas was marketed therefrom until many months after that date. If the position of the commissioners in this regard is correct, the leases have expired. Conversely if the position of The Carter Oil Company is correct such leases are valid and subsisting.

Before considering this matter it must be noted that the Corporation Commission of Oklahoma included all of said section 16 into one drilling unit. It set the drilling pattern which required the drilling of the well in the SE/4 of the SE/4 of the NW/4 of said section 16 which is not on the lands covered by the two leases from the Commissioners of the Land Office, and which are now owned by The Carter Oil Company, covering (the SE/4 and the SW/4) of said section 16.

■ Under these circumstances we look to the Conservation Act, 52 O.S.1951 § 87.-

1, subsection d of which provides in part as follows:

"* * *. The portion of the production allocated to the owner of each tract or interests included in a well spacing unit formed by a pooling order shall, when produced, be considered as if produced by such owner from the separately owned tract or interest by a well drilled thereon. * * *"

By virtue thereof the portion of the production attributable to an owner by reason of a tract pooled with another tract, when produced, is considered as if produced from said separately owned tract and thereby complies with the terms and covenants of such separate lease. Of necessity it follows that legislative intent in the use of the words "when produced" must be determined to enable us to arrive at a conclusion in this case.

■ Section 87.1, supra, was enacted in 1947. It would appear logical that for the purposes of extending the primary term, and complying with the "thereafter" clause fixed by the lease, the legislature intended the words "when produced" as used, should mean that which this court had theretofore held the word "is produced" to mean in such a case. In other words the purpose of the Act was the conservation of the oil and gas with particular attention directed to the protection of private lease contracts and the correlative rights of all parties in interest.

See Panhandle Eastern Pipe Line Co. v. Isaacson, 10 Cir., 255 F.2d 669, wherein it was concluded that a reasonable interpretation of the "thereafter" clause and the legal effect of an order of the Corporation Commission of Oklahoma combine to result in an extension beyond the primary term of a mineral deed if the well on the other portion of the pooled acreage satisfies the requirements of that clause.

■ Turning now to such decisions we find that we are committed to the rule that the terms "produced" and "produced in paying quantities" as used in commercial

oil and gas leases for a certain term and as long thereafter as oil or gas is produced in paying quantities, have substantially the same meaning and that unless oil or gas is found in paying quantities on or before such expiration date, when such leases are "completion" lease or if "commence" lease production within such period or the carrying out of drilling operations, the leases expire on that date. Thus to extend the fixed term in "completion" leases and acquire a limited estate in the land covered thereby the lessee must have found oil or gas upon the premises in paying quantities by completing a well thereon prior to the expiration of such fixed term. Roach v. Junction Oil & Gas Co., 72 Okl. 213, 179 P. 934; Parks v. Sinai Oil & Gas Co., 83 Okl. 295, 201 P. 517; Gypsy Oil Co. v. Marsh, 121 Okl. 135, 248 P. 329, 48 A.L.R. 876; Henry v. Clay, Okl., 274 P.2d 545.

In that connection the commissioners take the position that under such provisions discovery of oil or gas in paying quantities within such term is not sufficient, but that such production must be taken from the ground and marketed within such period. Citing Pine v. Webster, 118 Okl. 12, 246 P. 429; Prowant v. Sealy, 77 Okl. 244, 187 P. 235; Walden v. Potts, 194 Okl. 453, 152 P.2d 923. In addition the Commissioners contend that by virtue of Section 5 of the leases wherein it is stated "and provided further that unless a producing well in paying quantities of oil or gas is completed on the above described premises within five years from the date hereof, this lease shall be void", the leases expired unless oil or gas is run therefrom within such term, the word "produce" being defined as "to bring forth a product, produce or production, to bear, yield, make * * *". Webster's International Dictionary, 2nd Edition.

With this contention we cannot agree. In each of the cases cited in support thereof it was held that production in paying quantities which was thereafter run from the leases had not been discovered within the primary term thereof. Further in the case at bar, the gas had been brought forth and reduced to sufficient control for the purpose of running from the lease even though not marketed prior to the date of expiration.

■ . This court has held that in every grant there passes by implication that which is reasonably necessary to the enjoyment of the thing granted. Simons v. McDaniel, 154 Okl. 168, 7 P.2d 419; Champlin Refining Co. v. Magnolia Petroleum Co., 178 Okl. 203, 62 P.2d 249; McClain v. Harper, 206 Okl. 437, 244 P.2d 301.

■ The last cited cases are authority for the rule that the grant to a lessee "of the right to commence a well at anytime within the term fixed by the lease contract", [154 Okl. 168, 7 P.2d 420] by necessary legal implication carried with it the right to complete the well after the period fixed for commencement had expired, subject however, to abandonment of that right by failure to proceed in good faith and with diligence.

■ The leases involved in this case being what is known as "completion" leases, that is "a producing well in paying quantities" must have been completed within five years from the date thereof, the lessee or his assigns were granted the right to drill and complete a well producing oil or gas in paying quantities within such fixed term. By necessary implication this grant carried with it the right to obtain a market and sell the production therefrom after the period fixed for completion had expired. In other words this implication that which is reasonably necessary to the enjoyment of the thing granted, namely the right to complete a well producing oil or gas in paying quantities, is effectuated.

The condition precedent to the vesting of a limited estate in the land covered by the leases, in the lessee and/or his assigns, was the completion of a well, producing oil or gas in paying quantities. Such condition has been met. The well in question admittedly was completed within the specified primary term and was capable of producing gas in paying quantities. Should it have been required that there be an additional

condition precedent necessitating the marketing of the product within such fixed term the leases must have so specifically provided. See the case of McVicker v. Horn, Robinson and Nathan, Okl., 322 P.2d 410, wherein this court held that where such a lease does not by express terms provide for the marketing of the product, any covenant on the part of the lessee to market can only be by implication. In such event the lessee has a reasonable time after the completion thereof to comply therewith.

■ It is common knowledge that a market for the product can only be obtained after production has been discovered and the amount or volume determined. To effectuate the right granted, the completion of a well producing oil or gas in paying quantities within the primary term where there is no specific requirement that the product be marketed in that period, it is equitable and just that the lessee have a reasonable time, under the circumstances existing in the particular case, in which to find a market and run the production therefrom. Thereby the implied covenant to market the product so that the lessor will realize and receive the royalty therefrom, the basic consideration for the execution of the lease will be complied with and by reason thereof the lease extended beyond the primary term thereof.

■ The decisions of this court clearly indicate that we, in effect, are committed to the rule, that to extend a lease beyond the primary term, where the lease involved is a "completion" lease, a well must be completed within the primary term thereof or when the lease involved is a "commence" lease, a well must be commenced before and completed with due diligence after the primary term fixed therein, producing oil or gas in paying quantities and thereafter run and market such production; that in absence of a specified provision requiring the marketing thereof within such term the lessee has a reasonable time, depending upon the facts and circumstances of each case, in which to find a market and run the product so found and thereby comply with the implied covenant to market. Thereafter the producing and marketing must be continued in such quantities until the economic exhaustion of the product so discovered during the initial term, with the privilege of temporary cessation of production for a reasonable period of time for purposes such as recovering a market or reworking the well. Cotner v. Warren, Okl., 330 P.2d 217.

In other words in the absence of a specific clause requiring marketing within the primary term fixed in the lease, the completion of a well, as provided therein, capable of producing oil or gas in paying quantities will extend such term, provided that within a reasonable time the actual length of which must of necessity depend upon the facts and circumstances of each case, a market is obtained and oil or gas is produced and sold from such well. In such event if the producing and marketing thereof in such quantities from the well so completed is continued, the lease will extend until the economic exhaustion of the product.

This in no wise conflicts with the holding in Walden v. Potts, supra, wherein it was held that produced in paying quantities means not only discovery, but taking out oil or gas in pursuance of the covenants and purposes of the lease. Neither does it conflict with the opinion in McVicker v. Horn, Robinson and Nathan, supra, wherein the distinction between producing and marketing is recognized and wherein it was held that in the absence of express provision requiring marketing, the lessee has a reasonable time after the completion of the well to comply with the implied covenant to market. In actuality this conclusion implements and compliments both by making possible the exercise of the right granted, the completion of a well producing oil or gas in paying quantities within the primary term fixed by the lease, by allowing a reasonable time after discovery, depending upon the facts and circumstances of each case, in which to acquire a market and thereafter requiring the lessee to take and

market the product from such well in such quantities as will pay a profit to the lessee over the operating expenses in pursuance of the covenants and purposes of the leases.

The commissioners cite numerous cases from other jurisdictions, which although enlightening, expound a rule in conflict with the decisions of this court. We are in accord with the philosophy of our previous holdings which is re-announced herein.

Turning now to the record in this case and considering the evidence in the light of the foregoing rule: was due diligence in securing a market, under the facts and circumstances demonstrated, exercised?

Admittedly a well capable of producing gas in paying quantities was completed upon the drilling unit prescribed by the Corporation Commission of Oklahoma on February 24, 1955, before the expiration date of the leases, April 11, 1955.

The operating agreement between The Carter Oil Company, as operator, and the Texas Company, as non-operator, previously entered into, provided that the operator could not sell non-operator's portion of the production without its consent. The Texas Company lease contained a shut-in gas well clause which is not in the State leases.

The Carter Oil Company contacted by letter the companies it thought might be interested in taking the product in case the well was productive. The Cities Service Gas Company, which had a pipe line approximately twelve miles from the well in question, advised The Carter Oil Company shortly after the well was completed that it was willing to discuss a purchase proposal for the gas therefrom. As a result of such negotiations copies of proposed gas purchase contracts were submitted by Cities Service Gas Company to the Carter Oil Company on August 24,

1955 and September 16, 1955. Therein it was required that operator deliver the gas to its pipe line, which would have required the building of a pipe line by it and that all the gas produced therefrom be sold to the Cities Service Gas Company. The Texas Company refused to join in such contract.

Continued negotiations were carried on with other purchasers, as a result on March 19, 1956 The Carter Oil Company entered into a gas purchase contract with Colorado Interstate Gas Company, at a much better price than that offered by Cities Service Gas Company, and with the buyer taking the gas from the well head. The connection was made and the buyer is taking the gas.

In the meantime, at a large investment, The Carter Oil Company has participated in the drilling of other wells in the vicinity thereby increasing the gas available to a purchaser in that area.

The weighing of the evidence in the light of the facts and circumstances of this case clearly discloses that due diligence was exercised in the seeking and obtaining of a market as required by the practical exigencies of the situation obtaining, and that such market was found within a reasonable period of time under such circumstances obtaining. Strange v. Hicks, 78 Okl. 1, 188 P. 347; Bristol v. Colorado Oil & Gas Corp., 225 F.2d 894; McVicker v. Horn, Robinson and Nathan, supra. See also Gypsy Oil Co. v. Ponder, 92 Okl. 181, 218 P. 663.

Suffice it is to say that the evidence amply sustains the judgment of the trial court.

Judgment affirmed.

DAVISON, HALLEY, WILLIAMS, BLACKBIRD, JACKSON and CARLILE, JJ., concur.