Barbara E. FISHER, Suzanne Fisher Roberts, Maxine Snyder, Delores Trumbley, Helyn B. Shaklee, Edward Elmer McCrary, and Vera B. France, Appellees/Counter–Appellants,

v.

GRACE PETROLEUM CORPORATION, Peter Paul Petroleum Company, Headington Oil Properties, Inc., Mary Holmes Jones, Helen M. McLoraine, Texaco Producing, Inc., Appellants/Counter–Appellees.

No. 75833.

Court of Appeals of Oklahoma, Division No. 3.

Oct. 29, 1991.

Rehearing Denied Dec. 10, 1991.

Certiorari Denied May 19, 1992.

Arthur W. Schmidt, Helen Speer Chinn, H. Blanton Brown, Oklahoma City, for appellees/counter-appellants.

John T. Edwards, James M. Peters, Gayle Freeman Cook, Robert C. Smith, Oklahoma City, for appellants/counter-appellees.

## OPINION

HANSEN, Presiding Judge:

Appellants, Grace Petroleum Corporation, et al., (Lessees), seek review of the trial court's order canceling certain oil and gas leases and ordering them to remove equipment and plug a gas well situated on lands covered by such leases. Appellees, Barbara E. Fisher, et al., (Lessors), brought the action to cancel the oil and gas leases, thereby quieting title to the mineral estate in Appellees, and for money damages for Appellants' breach of duty to market the gas. The trial court found in favor of Appellees, but sustained Appellants' demurrer regarding Appellees' claim for damages. Appellees have counter-appealed those portions of the trial court's order sustaining Appellants' objections and demurrers to the evidence on Appellees' damages claim and ordering Appellants to plug the existing wellbore.

The seven leases subject to this action cover Section 25, Township 16 North, Range 12 West, Blaine County, Oklahoma. The leases had primary terms of five (5) years. In six leases (the "Fisher leases"), the "thereafter" provision of the habendum clauses provides the leases should remain in force "as long thereafter as oil, gas, casinghead gas, ... is or can be produced from said land...." The seventh lease (the "King lease") contained virtually identical language without the language "or can be". The Fisher leases contained shut-in royalty clauses which require shut-in royalty payments to be made if the well is shut-in for 12 months.[1] The King lease contained an advance royalty clause which required the payment of annual royalty within 90 days from the date the well was shut-in.[2] The evidence reflects advance royalty payments were made on the King

---

1. The clauses read: "... If, and for as long as any well or wells capable of producing gas, gas and gas condensate, or any other gaseous substances in paying quantities, are located on said land, or on land pooled therewith, this lease shall be deemed to be a producing lease under the 'thereafter' provision of the term clause hereof, and as such shall continue and remain in force. However, in the event that such well or wells are shut in and no production therefrom is used or marketed for a continuous period of twelve (12) months, and if this lease is not otherwise being maintained in force under some other provision hereof, lessee shall pay or tender to lessor (jointly or severally) or to lessor's credit (jointly or severally) in the depository bank designated for receipt of delay rentals hereunder, as royalty, an amount equal to the annual delay rental provided for in paragraph (5) hereof. Royalty ownership as of the last day of such period as shown by lessee's records shall govern the determination of the party or parties entitled to receive such royalty payment. Lessee shall use reasonable diligence to market gas or gas and gas condensate capable of being produced from such shut-in wells, but shall be under no obligation to market such products under terms, conditions or circumstances which in lessee's judgment exercised in good faith are unsatisfactory."

2. The King lease provides: "The royalties to be paid by lessee are: ... and (c) at any time, either before or after the expiration of the primary term of this lease, if there is a gas well or wells on the above land (and for the purposes of this clause (a) the term "gas well" shall include wells capable of producing natural gas, condensate, distillate or any gaseous substance and wells classified as gas wells by any governmental authority) and such well or wells are shut in before or after production therefrom, lessee may pay or tender an advance annual royalty equal to the amount of delay rentals provided for in this lease for the acreage then held under this lease and if such payment or tender is made, it shall be considered under all provisions of this lease that gas is being produced

lease for the 12–month period beginning April 13, 1989. The Fisher leases contain six-month temporary cessation clauses,[3] and the King lease contains a sixty-day temporary cessation clause.[4]

The oil and gas leases were held in force and effect beyond the five year primary terms by production from the Morlan No. 1–25 gas well located on the property. Appellant, Grace Petroleum Corporation, is the operator of the well. Appellants or their predecessors in title entered into two gas purchase contracts under which gas from the Morlan No. 1–25 well was to be sold to Oklahoma Gas and Electric Company (OG & E). Gas sold pursuant to the 1970 contract was to be sold at a base price of sixteen cents (16¢) per 1,000 cubic feet, escalating to nineteen cents (19¢) per 1,000 cubic feet at the end of the contract. Gas sold pursuant to the 1973 contract was to be sold at thirty cents (30¢) per 1,000 cubic feet, escalating one-half cent (1/2¢) per 1,000 cubic feet each year thereafter. Both contracts have twenty year terms and both contain take or pay provisions.

## I.

■ Appellants' first proposition of error is that the trial court's ruling cancelling the leases is against the clear weight of the evidence and contrary to law. An action to quiet title is an action of equitable cognizance and the judgment of the trial court will be sustained unless clearly against the weight of the evidence. *Barby v. Singer,* 648 P.2d 14 (Okla.1982).

## A.

■ The trial court found that the Morlan No. 1–25 well did not "produce in paying quantities" for the 12–month period from November 1, 1988 through October 31, 1989. Appellants attack this period of time for several reasons. First, they contend the court should have included November, 1989 production in calculating profitability and if November, 1989 production had been used, the court would have found that the well made a profit for the 13–month period. Second, Appellants assert the time period should not include months when the well was "shut-in". Appellants cite *Barby, id.,* for the proposition that the court should consider the entire history and reserves of a well to determine a reasonable period to calculate the well's profitability, and submit the prior five (5)

---

3. The Fisher leases provide:

"Should production from the above described land, or from acreage pooled therewith, cease from any cause after the expiration of the primary term this lease shall not terminate provided lessee succeeds in bringing back such production within six (6) months from such cessation or within such six (6) month period commences drilling another well on the above described land or on land pooled therewith, and prosecute the drilling thereof with due diligence to completion, and if such production is restored through any such operations this lease shall continue with the like effect as if there had been no cessation thereof."

4. The King lease provides:

" ... if, after discovery of oil, liquid hydrocarbons, gas or their respective constituent products, or any of them, the production thereof should cease from any cause, this lease shall not terminate if lessee commences reworking or additional drilling operations within sixty (60) days thereafter.... "

from the leased premises in paying quantities for one (1) year from the date such payment or tender is made, and in like manner subsequent advance annual royalty payments may be made or tendered; and it will be considered under all provisions of this lease that gas is being produced from the leased premises in paying quantities during any annual period for which such royalty is paid or tendered such advance royalty may be paid or tendered in the same manner as provided herein for the payment or tender of delay rentals; royalty accruing to the owners thereof on any production from the leased premises during any annual period for which advance royalty is paid may be credited against such advance payment; and when there is a shut-in gas well or wells on the leased premises if this lease is not continued in force under some other provision thereof, it shall nevertheless continue in force for a period of ninety (90) days from the last date on which a gas well located on the leased premises is shut in, or for ninety (90) days following the date to which this lease is continued in force by some other provision thereof, as the case may be, within which ninety-day period lessee hereunder may commence or resume the payment or tender of the advance royalty as herein provided."

1386

calendar years, including November, 1989, was the appropriate period.

■ Under the habendum clauses of the leases in question, the leases will remain in force and effect for five years and as long as gas is or can be produced. It is undisputed that the term "produced" when used in the "thereafter" provision of a habendum clause denotes production in paying quantities. *Barby*, at 16; *Hoyt v. Continental Oil Company*, 606 P.2d 560 (Okla.1980). A well will be deemed to be producing in paying quantities if it yields a return, however small, in excess of lifting expenses, even if well drilling and completion costs may never be repaid. *Barby*, at 16.

■ The appropriate time period for determining profitability is a time appropriate under all the facts and circumstances of each case. *Barby*, at 14. Although Appellants contend the appropriate period to determine profitability was the prior five calendar years, "... there is no apparent reason why such annual accounting period should be used in determining paying quantities for purposes of the habendum clause in the oil and gas lease." 2 *E. Kuntz*, The Law of Oil and Gas, § 26.7 (1990).

> The better rule precludes the use of a rigid fixed term for determination of profitability and uses a reasonable time depending upon the circumstances of each case, taking into consideration sufficient time to reflect the current production status of the lease and thus to 'provide the information which a prudent operator would take into account in whether to continue or abandon operation.'

*2E. Kuntz*, The Law of Oil and Gas, § 26.7, quoting *Texaco, Inc. v. Fox*, 228 Kan. 589, 618 P.2d 844 (1980).

The trial court based its findings regarding the profit of the Morlan No. 1–25 for the "year prior to the filing of this lawsuit". Suit was filed November 21, 1989, after lessors had sent written demand for release of their leases on November 3,

1989. The court apparently refused to consider the November, 1989, production.

We find no error in the time period used by the trial court to determine profitability. Appellants received written demand for release of the subject leases prior to the filing of this lawsuit. The written demand contained language that if releases were not received within ten days, appropriate legal action would be taken. It was not error for the court to exclude profits derived from the sale of gas from the well after Lessees received demand for release *in this case.*

■ Appellants' assertion that the court should not have considered profitability figures for months where the well was "shut-in" is also without merit. For reasons discussed in further detail below, we find that the trial court did not err in determining that the Morlan No. 1–25 was *not* a shut-in gas well. Accordingly, there was no error in including months of non-production in the 12–month period.

Appellees contend the 12–month period far exceeded the 6–month and 60–day temporary cessation of production provisions found in the leases as further evidence that the 12–month period was reasonable in this case. We agree. Appellants were given the benefit of the doubt regarding the profitability of the well. Under the leases here in question, the failure of the well to produce in paying quantities for the time period specified in the temporary cessation clauses, terminated the leases.

Appellants assert the Morlan No. 1–25 did not fail to produce gas for the time period specified in the temporary cessation clauses and that a temporary cessation clause will not operate to terminate a lease where a well on the leased premises is physically capable of producing in paying quantities.

■ Oklahoma has adopted the common law doctrine of temporary cessation of production which provides an oil and gas lease will continue in force during the sec-

ondary term unless the period of cessation, viewed in light of all the circumstances is for an unreasonable time. *Cotner v. Warren,* 330 P.2d 217 (Okla.1958). But where the parties have bargained for and agreed upon a period of time of cessation as reflected in the temporary cessation clause, that clause will control over the common law doctrine of temporary cessation. *Hoyt,* at 563. *French v. Tenneco Oil Company,* 725 P.2d 275, 277 (Okla.1986).

 After the primary term of a lease expires, the cessation of production clause modifies the habendum clause and extends or preserves the lease while the lessee resumes operations designed to restore production as required by the clause. In this case, the Fisher leases required the commencement of drilling and the King lease required reworking or drilling in order to preserve the leases. There was no evidence that the well was "reworked" or that other drilling commenced during this period. In the secondary term, the term "production" as used in the temporary cessation clause means production in paying quantities. *Hoyt,* at 563; *French v. Tenneco Oil Company,* 725 P.2d 275 (Okla.1986).

 The evidence reflects the longest span in the 12–month period the Morlan No. 1–25 went without actually producing some gas was approximately three (3) months. Because "production" requires production in paying quantities, the fact that the well actually produced some gas within the time period specified in the temporary cessation clause will not necessarily save the lease. Where a well ceases production in paying quantities and such cessation is not temporary, an oil and gas lease may be cancelled. *Barby,* at 16.

 Having determined the time period employed by the trial court was appropriate, we next must review the evidence to determine whether there was production in paying quantities for this period. Both parties introduced evidence of lifting expenses and sales from the well. Appel-

lants' own figures, which were used by the trial court in making its finding of unprofitability, show a loss for the 13–month period. Further, the well failed four deliverability tests in 1987 and 1988. The finding that the Morlan No. 1–25 was not producing in paying quantities is supported by the evidence.

**B.**

 In Part B of their first proposition of error, Appellants assert the trial court erred in cancelling the leases based upon the erroneous standard that the well did not *actually* produce in paying quantities. They contend the physical "capability" or possibility that a well may produce in paying quantities is sufficient to maintain an oil and gas lease under the terms of the habendum clause after the expiration of the primary term. Appellants cite *McVicker v. Horn, Robinson & Nathan,* 322 P.2d 410 (Okla.1958), *State ex rel. Commissioners of the Land Office v. Carter Oil Company of West Virginia,* 336 P.2d 1086 (Okla.1958), and *Flag Oil Corporation of Delaware v. King Resources Company,* 494 P.2d 322 (Okla.1972) in support of their position that capability alone is enough. These cases involve wells which were completed during the primary term of the lease and were capable of production but were shut-in for lack of a market. Those cases stand for the proposition that to extend the primary term of a "completion" type oil and gas lease by production, it is sufficient if the lessee has completed a well within the specified primary term and the well is capable of producing oil or gas in paying quantities. Provided, lessee must within a reasonable time thereafter, obtain a market for the oil or gas and produce and sell such oil or gas. After such marketing has occurred, the *production and marketing* must continue in paying quantities with the privilege of temporary cessation of production. *Carter Oil,* at 1095.

 Appellants contend the Morlan No. 1–25 was "capable" of production in

paying quantities and that alone is sufficient to sustain the leases under the habendum clause and prevents the application of a temporary cessation clause. Appellants have confused two separate issues: "capability" is used in the case law when referring to wells completed and capable of paying production for purposes of extending the lease to the secondary term. Capability alone does not operate to suspend the application of this temporary cessation clause which operates when a well ceases production in paying quantities for any cause for longer than the provided time. To hold physical capability alone is sufficient to maintain the lease would render temporary cessation clauses superfluous and would allow lessees to hold on to leases indefinitely. The flip side of Appellants' argument is that the temporary cessation clause only applies to a well incapable of production in paying quantities. This construction would create an absurdity because a well incapable of production in paying quantities would expire by its own terms, rendering the temporary cessation clause meaningless. As stated above, the Morlan No. 1–25 was found not to have produced in paying quantities for the 12-month period. Even if the well may have been made capable of such production, that fact would not help Appellants.

## C.

Appellants next assert the trial court erred in failing to construe the oil and gas lease contracts as a whole and that by cancelling the leases pursuant to the temporary cessation clauses, the court rendered the shut-in royalty clauses of the leases meaningless. Appellants argued at trial and on appeal, that the Morlan No. 1–25 well is a shut-in gas well and therefore, the habendum clause was satisfied and the leases were maintained. The trial court found the Morlan No. 1–25 did not constitute a shut-in gas well for the reason that it was incapable of production in paying quantities.

The evidence reflects payments were made pursuant to the advance royalty clause of the King lease only. There was also evidence that OG & E requested the well "shut-off" in September, 1988, March, 1989, and June, 1989, because gas from the well could not be delivered into the pipeline.

In Oklahoma, a shut-in gas well must be capable of production in paying quantities. A well which is incapable of production in paying quantities cannot be considered "shut-in" as that term is used in a shut-in royalty clause and is insufficient to hold the lease under the habendum clause. *Bixler v. Lamar Exploration Company*, 733 P.2d 410, 412 (Okla.1987); *Gard v. Kaiser*, 582 P.2d 1311 (Okla.1978). As the trial court noted, merely shutting the valve from the well to the pipeline or sending out advance royalty payments does not necessarily mean the well is "shut-in" for purposes of extending the lease under the habendum clause. Nor does the fact the gas purchaser has requested the unprofitable well shut off make the well "shut-in".

> "[T]he shut-in gas royalty clause in common use does not become operative unless a gas well has actually been shut-in. It is also readily apparent that the requirement that the well be shut-in does not refer to any particular type of engineering operation but refers to the absence of current production." 4 *E. Kuntz*, The Law of Oil and Gas, § 46.4(b) (1990).

For the reasons outlined in Subsection B above, we find the decision of the trial court that the Morlan No. 1–25 was not a shut-in gas well to be substantiated by the evidence. Having so found, we decline to consider the relationship of temporary cessation clauses to shut-in royalty clauses.

## II.

Appellants next contend the ruling of the trial court is contrary to Oklahoma law because it violates this State's statutory policy against forfeiture. Appellants

believe they should not have their leases cancelled because they have found and developed valuable gas reserves and they have not lacked diligence in the production of such gas. Appellants cite *Barby v. Singer, supra, Stewart v. Amerada Hess Corporation,* 604 P.2d 854 (Okla.1979) and 23 O.S.1981, Section 2 in support of their position.

 Both *Stewart* and *Barby* provide that compelling equitable circumstances may relieve a lessee from the harsh decree of lease cancellation where the well in suit has ceased production in paying quantities. Those cases are distinguishable from the situation at hand, in that the leases now before us contain temporary cessation clauses which operate to modify the habendum clauses of the leases. The leases in *Stewart* and *Barby* did not contain temporary cessation clauses but were analyzed under the common law doctrine of temporary cessation. A bargained for and agreed upon temporary cessation clause controls over the common law doctrine of temporary cessation. *Hoyt,* at 563. As such, the circumstances and cause of the cessation cannot be considered by the court in overriding the fixed period of time specified in the temporary cessation clause. *Hoyt,* at 564; *French v. Tenneco Oil Co.,* at 277. Although equity may be invoked to avoid forfeiture of leases under the doctrine of temporary cessation and in cases where the leases contain clauses similar to determinable fee estates (for example, shut-in royalty clauses) if compelling equitable circumstances exist, it cannot be invoked to revive a lease whose habendum clause has been modified by a temporary cessation clause and has thus terminated by its own terms. *French,* at 266. *See also Blaser Farms, Inc. v. Anadarko Petroleum Corporation,* 893 F.2d 259 (10th Cir.1990).

## III.

 In their third proposition, Appellants urge the trial court erred in determining Appellees were not required to make demand for compliance with the implied lease covenants before filing suit. Prior to suit, Appellees sent written demand for release of the subject leases to Appellants. This demand letter did not include demand for compliance with any implied covenant.

 It is well settled law in this state that as a prerequisite to forfeiture for breach of an implied covenant in an oil and gas lease, a lessor must make demand upon the lessee to comply therewith, including a reasonable time for the lessee to comply. *Vincent v. Tideway Oil Programs, Inc.,* 620 P.2d 910 (Okl.App.1980); *Mitchell v. Amerada Hess Corporation,* 638 P.2d 441 (Okla.1982). This action, however, is brought to quiet title because Appellees' leases have expired by their own terms for failure to produce in paying quantities or pursuant to the temporary cessation provisions, thus clouding Appellees' title. The action also includes a cause of action for damages suffered by Appellees for Appellants' breach of duty regarding the marketing of gas from the Morlan No. 1–25 well.

The distinction between a suit for cancellation of a lease for breach of covenant and suit for cancellation of a lease where the lease has expired under its own terms is succinctly set forth by *Williams & Meyers:*

> The conceptual differences between enforcing a covenant by the extraordinary remedy of cancellation (permitted because of the inadequacy of the legal remedy) ... and the automatic expiration of a lease under a special limitation explain why notice and demand are not required in suits based on the latter theory. No forfeiture is involved, so it is said, when a lessor seeks to cancel a lease that has expired under its own terms.

*Williams & Meyers,* Oil and Gas Law, § 682, page 339 (1990). See also *Curtis v. Harris,* 76 Okla. 226, 184 P. 574 (1919). Because the subject leases have expired by their own terms, we find that demand for compliance and an opportunity to cure were

not required. Nor was such demand required to preserve Appellees' claim for damages for Appellants' failure to diligently and prudently market because an action for damages is not an equitable action.

> If the lessee's breach of duty has already inflicted damages on the lessor, notice, demand, and opportunity to cure would seem to be irrelevant to an action to recover for such damage. No action by the lessee to repair the breach could affect the lessor's right to compensation for the damage that has already occurred.

*Williams & Meyers,* Oil and Gas Law, § 682, page 338 (1990). Accordingly, we find no error in the trial court's determination that demand for compliance was unnecessary.

The next two propositions of error are raised by Appellees in their Counter-appeal.

## IV.

■ Appellees assert the trial court erred in sustaining Appellants' demurrer and objections to Appellees' evidence on the issue of breach of Appellants' duty to diligently and prudently market the gas from the Morlan No. 1–25 well and damages resulting therefrom. Appellees contend such breach occurred by virtue of Appellants failure in 1984 to renegotiate the gas contracts which cover the Morlan 1–25 well. Appellees sought damages in the amount of Twenty Five Thousand Eight Hundred Forty Five Dollars and Thirty Five Cents ($25,845.35), the difference between the amount actually received under the existing contracts for the period from October, 1984 through December, 1989, and the amount they believe they would have received under the proposed renegotiated contract.

The trial court sustained Appellants' objections to evidence regarding an offset well, the Dunn No. 1–30 well, and evidence establishing the amount of damages. Regarding the proffered testimony concerning the Dunn No. 1–30 well, Appellee's tender of proof provides: the gas from both wells was originally covered under the existing gas purchase contracts on the Morlan No. 1–25 well, with gas from the Dunn well subsequently renegotiated under a different contract for a higher price; the Dunn well is the immediate offset to the Morlan well, drilled to the same geological formation at the same time; that the gas meters for two wells are 15 feet apart and produce into the same gas line; that Appellants operated both wells until the mid–1980's; and that the Dunn well was put on a compressor and produced approximately a half-million dollars of gas while the Morlan well operated at a loss for the same period of time.

■ Appellee's damages claim stems from Appellants' failure to diligently and prudently market the gas as evidenced by their failure to renegotiate the gas purchase contracts in 1984. Appellants' actions in operating the Dunn well are irrelevant to this claim. While evidence of a lessee's actions in operating a well on adjacent land is relevant to a cause of action for breach of covenant to prevent drainage and to protect correlative rights, such evidence is not relevant to the case at hand which involves no such issues. *Leck v. Continental Oil Company,* 800 P.2d 224 (Okla.1989). The issue to be resolved here is whether Appellants breached the implied duty to market the gas from the Morlan well by failing to accept the terms of the proposed gas purchase contract. Accordingly, the trial court did not err in sustaining Appellants' objection to such evidence.

■ Unlike law actions, a demurrer in equity does not require a judge to disregard all evidence favorable to the demurrants' position but requires the judge to consider and weigh all the evidence adduced to determine in whose favor it preponderates. *Bixler v. Lamar Exploration Company,* 733 P.2d 410, 412 (Okl.1987). Although the quiet title portion of this action is equitable, the damages claim is not. Therefore on appeal, the order of the trial

court sustaining the demurrer will be upheld if there is an entire absence of proof tending to show any right to recover. *Haenchen v. Sand Products Company, Inc.*, 626 P.2d 332 (Okla.App.1981). In passing upon a demurrer, the trial court must consider as true all evidence favorable to the party against whom it is directed, together will all inferences which may be drawn therefrom while disregarding all conflicting evidence. *Haenchen, supra,* at 334.

Counter–Appellants contend Appellants breached the duty to market based upon their failure to renegotiate the existing gas purchase contracts in 1984. The evidence supports the existence of negotiations between Appellants and the current gas purchasers which included, among other things, an increase in price for the gas. The gas purchaser offered these terms upon the consideration that Appellants install a compressor on the well. It is uncontroverted that the offer would have required Appellants to waive a take or pay provision, thereby creating no obligation on the part of the purchaser to purchase gas, and to extend the contract for the life of the lease. No evidence was introduced which indicated the existing gas purchase contracts were unreasonable when entered into, although Appellee did offer evidence that a prudent operator would have accepted the terms of the proposed contract.

 Oklahoma recognizes the duty of a lessee to diligently and prudently market the oil and gas produced under a lease as incident to the lessee's contractual responsibility to produce oil, gas and minerals in paying quantities. *State v. Carter Oil Company of West Virginia*, 336 P.2d 1086 (Okla.1958); *McVicker v. Horn, Robinson and Nathan*, 322 P.2d 410 (Okla.1958). Whether or not due diligence has been exercised depends upon the facts and circumstances of each case and whether lessee has exercised that degree of diligence exercised by a prudent operator having regard for the interests of both the lessor and lessee. *Strange v. Hicks*, 78

Okla. 1, 188 P. 347 (Okla.1920); *Eggleson v. McCasland*, 98 F.Supp. 693 (E.D.Okla.1951). *See also Gazin v. Pan American Petroleum Corporation*, 367 P.2d 1010 (Okla.1961) (no breach of covenant to market where proposed gas purchase contract had no take or pay provision.) Having reviewed the evidence presented at trial, we do not find the judgment of the trial court sustaining the demurrer to the evidence to be against the clear weight of the evidence.

## V.

 In the final proposition of error, Appellees/Counter–Appellants assert the trial court erred by ordering the defendants to plug the borehole of the Morlan No. 1–25 well and to remove their equipment. Appellees seek vacation of this portion of the order and a remand for a determination of fair market value of the casing less costs, and presumably an order vesting title of the borehole in Appellees upon payment to Appellants. Appellants contend they have the right to remove the casing and other equipment pursuant to an express provision in each lease allowing lessee to remove "all machinery, fixtures, houses, buildings, and other structures placed on the premises, including the right to draw and remove all casing" after the lease expires.

The Oklahoma Legislature has determined the prevention of waste of natural resources to be an important public policy of this State. 52 O.S.1981, § 86.3. However, there is no Oklahoma case law expressly authorizing royalty owners to assume ownership of the borehole or casing of a well which has been judicially determined to have expired for failure to produce in paying quantities. Other jurisdictions have, however, vested title of the well and casing in the lessors in certain circumstances, upon lessor's payment to the lessee of the reasonable value of the casing less the costs of pulling, plugging and nonrecoverable casing. *Eubank v. Twin Mountain Oil Corporation*, 406 S.W.2d

789 (Tex.Civ.App.1966); *Patton v. Rogers,* 417 S.W.2d 470 (Tex.Civ.App.1967).

In *Eubank, supra,* the trial court denied lessee the right to remove casing from three wells which had not produced in paying quantities, contrary to an express lease provision authorizing such removal. Factors considered by the court included evidence that the pulling of the casing could not be accomplished without destroying the well bores, resulting in waste of natural resources, and geological and engineering information that the wells were reasonably capable of producing in paying quantities if re-entered and re-worked. Further, the lessee had not demonstrated that the casing had any unique characteristics which would make it more valuable than comparable casing available on the market. The court based its reasoning in part on the public policy in Texas against waste of natural resources.

■■■■ In *Champion Ventures, Inc. v. Dunn,* 593 P.2d 832 (Wyo.1979), the Supreme Court of Wyoming denied the lessees the right to remove casing from a well capable of production in paying quantities. The Court held that before the plaintiff would be entitled to reasonable compensation for the casing, he must prove by sufficient evidence (1) that the well is producing or is reasonably capable of producing and probably will produce, in paying quantities and (2) the reasonable market value of the casing, after deducting the costs of pulling, plugging and nonrecoverable casing. *Champion Ventures,* at 834. This is consistent with the Oklahoma Supreme Court's decision in *Okmulgee Supply Corporation v. Anthis,* 189 Okl. 139, 114 P.2d 451 (1940), which denied the lessee the right to remove, prior to the termination of the lease, the casing of a well which was producing in paying quantities. *See also Briggs v. Waggoner,* 375 P.2d 896 (Okla.1962); E. Kuntz, *The Law of Oil and Gas,* § 50.3 p. 284 (1990). We think the reasoning in the above-cited cases is sound and hold that a lessee may, under certain circumstances, be denied the right to pull casing from a well which has ceased production in paying quantities if there is sufficient geological and engineering evidence to indicate that the well could be made capable of production in paying quantities.

The record before us is silent on the issue of whether the removal of the casing would destroy the borehole and whether the character of the casing was not unique and available for purchase on the market. The evidence presented at trial, reveals the following: The pumper of the Morlan No. 1–25 well testified that the well was only able to produce gas after being "blown-down", that the success rate after such blow-downs was roughly sixty percent, and the well reaches equilibrium with the line pressure a few days after each blow-down. Appellees' expert witness testified compression would increase the volume of gas produced and if the well was produced in the "correct manner" and if the gas contract was renegotiated, the well would have the ability to produce in paying quantities. The letters of renegotiation of the gas contracts indicate the price increase was offered in consideration of Appellants' equipping the well with a compressor. The recoverable reserves left in the well were estimated at 500 to 600 Million Cubic Feet (MCF).

On the basis of the evidence before us, we do not believe Appellees presented sufficient evidence that the Morlan No. 1–25 well could be made capable of production in paying quantities and probably would produce in paying quantities. Accordingly, we find no error by the trial court in ordering Appellants to remove equipment and plug the well.

AFFIRMED.

HUNTER, C.J., and JONES, J., concur.